[File. No. 7255]

EVA TRUSCOTT and R. L. Truscott, Respondents, v. LUDVIG PETERSON and M. B. Monson, Appellants.

(50 NW2d 245)

Opinion filed Nov. 30, 1951

*Strutz, Jansonius & Fleck* and *Hyland & Foster,* for Appellants.

500

*Cox, Cox & Engebretson,* for respondents.

SATHRE, J. This is an action brought by Eva Truscott and R. L. Truscott, wife and husband, copartners, plaintiffs, against Ludvig Peterson and M. B. Monson, defendants, to recover damages alleged to have been sustained by reason of negligence on the part of the defendants in excavating trenches on a lot adjacent to a building in which the plaintiffs were operating a grocery business.

The complaint alleges that for several years prior to September 6, 1947, the plaintiffs, as copartners, operated a grocery store under the name of "Park Foods" in a building located on lot 29, block 30, original plat of the City of Bismarck, North Dakota. That the plaintiffs had purchased lots 30 and 31 immediately adjacent to the lot and building in which they operated their grocery business. They entered into a general contract with the defendant Ludvig Peterson for the construction of a new building on said lots 30 and 31 where they planned to move their grocery business. Under the terms of the contract the defendant, Peterson, agreed to construct the building to its entire completion including excavating for the footings and foundation;

he contracted with the defendant, Monson, to do the excavating for the footings and foundation. The complaint then alleges that the excavation was done in such careless and negligent manner by the defendants, without taking proper precaution to provide lateral support that by reason of such negligence on the part of the defendants the building in which the plaintiffs were operating their grocery business collapsed and fell into the excavation for the new building, destroying merchandise, equipment, show cases and other property housed in such building to the damage of the plaintiffs in the sum of $15,000.00.

The defendants answered separately. The defendant, Peterson, admits that he entered into a contract with the plaintiffs for the construction of a store building upon lots 30 and 31, owned by the plaintiffs as alleged in the complaint, but denies that he was negligent in excavating for the foundation of the new building; that the damages which resulted to the plaintiffs by reason of the collapse of the building occupied by them was due to the loose condition of the soil supporting it; that its foundation was faulty and that it was not constructed as required by the revised building ordinance of the City of Bismarck for 1939, as to the depth below the street level and other requirements of such ordinance; that the plaintiffs were aware of the faulty construction of said building and the loose soil supporting it. He further alleges that while he had the general contract for the construction of a new building he sublet the excavation for the foundation to the defendant, Monson, who did such excavation as an independent contractor, and that defendant Peterson had no control, supervision or authority over the work being done by the defendant, Monson, and that the plaintiffs had knowledge of the fact that the defendant, Peterson, did sublet the excavation to the defendant, Monson, and consented thereto.

The answer of the defendant, Monson, denies any and all liability for any damages to the plaintiff and denies specifically any negligence in excavating for the building to be constructed for the plaintiffs; denies that he did such excavation as an independent contractor and alleges that he furnished to the defendant, Peterson, certain power equipment, and a skilled operator and a helper, at a hire rate by the hour, and that such

equipment and operators were at all times under the direct supervision and control of the defendant, Peterson.

By stipulation of the parties the case was tried to the court without a jury. At the opening of the trial plaintiffs' counsel stated that the amount of damages they expected to prove would not exceed $8,500.00. The court found in favor of the plaintiffs and against both of the defendants, and held that the collapse of the building and the damages sustained by the plaintiffs were due to the careless and negligent manner in which the defendants and their employees excavated the trenches for the new building, and order judgment to be entered in favor of the plaintiffs and against the defendants in the sum of $8,489.00.

It is the contention of the plaintiffs that the collapse of the building and resulting damages were caused by the careless and negligent manner of the defendants in excavating along the Mundy building; that the defendants saw that the soil was loose and was caving in, and that notwithstanding the caving in of the soil they continued excavating without taking any precaution to shore up and brace the wall, or to notify the plaintiffs, and that as a result the building collapsed.

The defendants contend, however, that the caving of the soil was due to the added weight of the building thereon, and that in its natural condition the soil would not have caved in, and that the caving in was due to the negligent and improper construction of the building by the plaintiffs in that it did not have proper footings and foundation; that the plaintiffs knew that the excavation was being made and knew of the loose condition of the soil, and did not notify the defendants thereof and that plaintiffs took no steps to protect said building from danger caused by such excavation.

The defendants have appealed to this court and demand a trial de novo.

The main contentions of the defendants in this appeal as set forth in their joint specifications of error are as follows:

1. That the right of lateral support applies only to the land itself and does not apply to buildings or artificial structures thereon.

2. That the collapse of the building occupied by the plaintiffs

and the resulting damages were not due to any negligence of the defendants or either of them, but were due to the faulty construction of the building and the loose, filled in soil upon which it was situated.

3. That the plaintiffs did not take proper measures to make arrangements for continuation of their grocery business so as to reduce their damages, if any damages there were, for which the defendants were liable.

4. That the evidence does not sustain the damages allowed by the district court.

5. The defendant Monson assigns as error that the district court held, in effect that he was an independent contractor.

6. The defendant Peterson contends that since the district court held the defendant Monson to be an independent contractor, if there was any liability, the defendant Monson alone would be liable.

The undisputed facts are substantially as follows: From June 1941 to September 6th, 1947, the plaintiffs operated a grocery business in a building located on lot 29, block 30, original plat of the City of Bismarck, owned by A. W. Mundy, under a month to month lease. Sometime prior to September 1947, the plaintiffs had purchased lots 30 and 31, block 30, original plat of the City of Bismarck, N.D., immediately adjacent to the lot and building in which they were operating their grocery business. Their purpose in purchasing these lots was to erect a building of their own for their grocery business. Accordingly, they entered into a written contract with the defendant Ludvig Peterson, by the terms of which Peterson agreed for a stipulated consideration to construct the entire building to its final completion, including the excavation for footings, foundation and basement. He·made arrangements with the defendant, M. B. Monson, for excavating for the footings, foundation and basement, and the defendant, Monson, furnished a power shovel, an operator and a helper to do the excavating necessary for the new building at an hourly rate.

On September 5th, 1947, the defendant, Monson's employee Sylvester Ewonuik, and Leon Larson, a partner of the defendant Monson, moved the power shovel to said lots 30 and 31, and

started excavation for the new building. On the morning of September 6, 1947, they finished excavating on the east side of lot 31 and on the north side of lots 30 and 31, and began excavating on the west side of lot 30, next to lot 29, on which was located the building in which the plaintiffs operated their grocery business. The excavation along the east side of the building was completed about 11 o'clock in the morning of September 6th and shortly thereafter the Mundy building collapsed and fell into the excavation, wrecking; the east side of the building and destroying merchandise, fixtures, equipment and other property. The soil of the three lots 29, 30 and 31, was composed of light, sandy, loose earth, cinders, ashes and debris that had been filled in from time to time.

The plaintiff R. L. Truscott, testified; that some two or three years prior to the collapse of the building he had made an excavation on the east side of the Mundy building for the purpose of installing a drain, and that he discovered that there were no footings under the building, and that the soil was loose, and had been filled in. A short time before they entered into the contract for the construction of the building the defendant Peterson and Truscott made a trip to Minneapolis for the purpose of purchasing steel for the proposed building and at that time he told defendant Peterson, about putting in the floor drain, and about the condition of the soil under the Mundy building and that there was a foundation under it but no footings; that the defendant Peterson made the following reply: "well, that is a good thing to know because it would surely be a mess if the soil caved in". Peterson, however, stated that he did not remember such conversation and that he believed it had not taken place. Truscott testified further that the power shovel would strike against the wall of the building causing it to shake as it slid up and down along the wall.

Gilbert Bourgois, a witness for the plaintiffs, testified that he was engaged in the contracting business and had been so engaged for 15 years; that he was familiar with the Mundy building in which the plaintiffs had conducted a grocery business, and that after its collapse he purchased it from the owner; that he was acquainted with the nature of the construction of the building,

its foundation and footings under the walls. He was also familiar with the type of soil supporting the building; that if an excavation 6 ft in depth and 3 to 4 ft in width was made adjacent to the east side of the wall it would be prudent and proper and the customary practice for the excavating contractor to support the old wall by bracing or underpinning.

The defendant Peterson was called by the plaintiff for cross examination under the statute and testified as follows:

Q. Now, you have been a contractor and builder, Mr. Peterson, for about twenty-seven years, and you are familiar with that foundation there was under the old building owned by Mr. Mundy, were you not?

A. Yes.

Q. You are also familiar with the type of soil that there was along that building wall, are you not?

A. Yes.

Q. Are you familiar with the manner in which that old building was built and constructed?

A. Yes.

Q. Its material and the manner in which it was put together?

A. Yes.

Q. And you know, do you not, the type of excavation that was made along the side—the east wall of the building?

A. Yes.

Q. Its depth and relative position adjacent to the wall?

A. Yes.

Q. Based upon your knowledge, Mr. Peterson, of the nature of the construction and the material of the old building, and foundation that was under it, and nature of the soil upon which it rested, and the size, the extent and location of the excavation that was made, then good contracting practice and a prudent and reasonable contractor would have shored or underpinned the wall?

A. What?

Q. Should it have been shored up or underpinned?

A. I'd say "Yes".

David Evans, a witness for the defendant Peterson, testified

that he was Peterson's foreman when the Truscott building was being constructed. He was not present when the equipment of the Monson Contracting Company was moved to the Truscott lots and did not recall whether he was there when excavation was started. He did not direct anyone having to do with Monson Contracting Company as to where they should start excavating, and did not know where they started. He denied that the witness Ewonuik told him about the soil caving in, and that the testimony of Ewonuik as to a conversation with him relative to the condition of the soil was incorrect.

Leon Larson, a witness for the defendant, Monson, testified that he was a partner in the Monson Contracting Company, and that the business of the company was digging ditches, excavating basements and etc., and that the company was in the business of leasing out machinery for excavating; that the defendant, Ludvig Peterson had arranged with the defendant, Monson, to do the excavating for the building to be constructed for plaintiffs; that in leasing the equipment for excavation it was the custom to furnish a skilled operator and a helper to go with the machine; that he accompanied Sylvester Ewonuik, the operator of the power shovel on September 5, 1947, to plaintiffs' lots 30 and 31, for the purpose of excavating for the footings and foundation of the new building; that one, Evans, foreman of the defendant, Peterson, showed him the stakes and lines where the excavating was to be done.

Sylvester Ewonuik, the operator of the shovel, a witness for the defendant Monson, testified that he noticed that the soil was caving in, and that he so informed Evans, the defendant Peterson's foreman, and suggested that braces or underpinning should be placed against the wall for the protection of the building.

We quote from his testimony:

Q. Did you say anything to Evans about the condition of the soil?
A. Yes, sir.
Q. What did you say?
A. I told him that I believed it would cave in.

Q. You believed that it would cave in?

A. Yes.

Q. You told Evans that?

A. Yes.

Q. What did Evans say?

A. He said that I was half done and to go ahead and when I get through they will stick in forms and pour concrete.

Q. You told him about it?

A. He could see it.

Q. Evans told you to go right on and dig?

A. Yes.

Q. Did you tell him it should be shored up and braced up?

A. I got off the machine and went down to check for the grade and then it is coming in—caving in—and I stopped digging and called him over and I said "That is going to cave in. You had better get the props out, or something", and he looked it over and said "Go ahead digging". And he said that the minute I get through digging, they will stick the forms in and pour the concrete.

Q. Did you take that as an order and a direction from Evans to continue to dig?

A. Yes, sir.

Q. Prior to that time you had done some excavating—did you dig test holes to see the nature of the soil?

A. No, sir.

Q. Did you call Evans's attention to that, when you had taken a few shovels of dirt out?

A. Yes, sir.

The defendant Monson testified that the defendant Peterson made arrangements with him for the use of the power shovel and operators and that the Monson Contracting Company paid the operators their wages and their Workmen's Compensation Insurance premium.

Paul Fossum, a witness for the defendant Monson testified that he was a partner in the Monson Contracting Company and its bookkeeper. That his company was in the business of renting out excavation equipment and furnishing operators for such

equipment. At the request of the defendant Monson, he sent the power shovel, operator Ewonuik and helper Leon Larson to do the excavating for the Truscott building, and that defendant Peterson paid for the equipment and operators at the rate of $10.00 per hour. He stated that the duties of the helper Larson were to see that the excavation was performed at the proper elevation and to go down and see that the elevation was maintained throughout the job.

This is not an action between adjoining landowners. The plaintiffs were not the owners of the wrecked building or the lot upon which it was situated. They had not built it and there is no evidence in the record as to who built it or when it was built. The plaintiffs had occupied it under a month to month lease since June 1941, and it had been occupied by at least two tenants prior to that time. Clearly the plaintiffs could not be held responsible for any defects in its construction.

The complaint alleges that by reason of the carelessness and negligence of the defendants in excavating along the wall of the building in which plaintiffs conducted their grocery business without taking proper precaution as to lateral support, or by improper use of excavating machinery, caused the building to collapse and to fall into the excavation made by the defendants for the new building. The main issue is therefore whether the damages sustained by the plaintiffs were caused by the negligence of the defendants or either of them.

We shall first consider whether the evidence establishes actionable negligence on the part of the defendant Ludvig Peterson. He had the general contract for the construction of the building including all excavation. Primarily it was his duty to see that the excavating was done with due care and skill, having due regard for the safety of adjoining buildings.

The general rule is that one who excavates next to a building owned or occupied by another must use ordinary care and skill, and he will be liable to the owner or occupant for damages resulting from his negligence.

"Where the character of the soil is such that damages will result unless some precaution to support the building temporarily is taken, a failure to support the soil may amount to neg-

ligence, rendering the excavator liable." Gildersleeve v. Hammond, 109 Mich 431, 67 NW 519, 33 LRA 46. Kiksajksz v. Brosz, 158 A 620, 104 Pa Super 246.

"One who excavates near the boundary line of his own land is not liable, therefor in the absence of negligence, if but for the added weight of the buildings, no damage would have resulted to his neighbor's land. Where such work was negligently done, the excavator is liable for the damage to both land and buildings." 1 Am Jur Sec 30, 524.

The defendant Ludvig Peterson admitted on cross examination from which we have quoted that he was familiar with the type of soil along the wall and under the collapsed building, the method of excavating along the wall, and that good contracting practice and prudent and reasonable contractors would have shored or underpinned the wall.

We have quoted from the testimony of the plaintiff Truscott to the effect that he advised the defendant Peterson of the condition of the soil under the Mundy building. Peterson said he did not remember such conversation, although he did not deny that it had taken place, and admitted on cross examination that it would have been prudent to shore or underpin the wall of the building.

David Evans was defendant Peterson's foreman on the Truscott job. Ewonuik, the operator of the power shovel, a witness for the defendant Monson, testified positively that he told Evans that the soil was caving in and that "you better get the props out, or something", and that Evans looked it over and said "go ahead digging". In any event Evans must have been aware of the danger to the building, if no precautionary steps were taken before proceeding further with the excavation. Nor is there any evidence in the record that the defendants notified the plaintiffs of the dangerous situation so as to enable them to take some precautionary measures to prevent damages to the building and its contents.

Under the evidence we are satisfied that the defendant Ludvig Peterson and his employees were guilty of negligence in failing to shore up or underpin the supporting wall of the building so as to prevent its collapse.

The next question for consideration is whether there was negligence on the part of the defendant M. B. Monson so as to make him jointly liable with the defendant Peterson.

Sylvester Ewonuik was the employee of the defendant Monson. He testified that Larson, a partner of Monson, told him where to start the excavation, and when Larson left he told Ewonuik that in case the soil should start to cave in he should see Evans, or the defendant Ludvig Peterson.

We quote from his testimony:

Q. What I am trying to find out—How far had you gone from the sidewalk, south, at that time, Mr. Larson left?

A. I got about half ways when I called one of those men and told him to get one of the jacks out.

Q. That is not the question. I asked you how far you had dug from the sidewalk, south, when Mr. Larson left. MR. FOSTER: He told you. He said "About half way".

A. Well, I will say about half way.

Q. Mr. Larson was around there and in the ditch part of the time. Isn't that correct?

A. Yes, those first couple of days.

Q. He was in the ditch that morning also?

A. Yes.

Q. He was using an eye-level in the ditch?

A. Yes.

Q. He was using an eye-level in the ditch?

A. That's right.

Q. He had been using the eye-level in the ditch that morning?

A. Yes, sir.

Q. How did it happen, Mr. Ewonuik, that you asked Mr. Larson who you should call if it would start caving in?

A. Because I was working under Larson and he was leaving and I thought if I got stuck I didn't know what to do and whether I should sit there. He told me to see one of those men.

Q. Did you ask Mr. Larson what to do if it started caving?

A. Well, no, sir—that is what I asked him was what I should do when it started caving.

Q. Did you ask him what to do?

A. No, sir.

Q. How did you happen to ask him who you should ask?

A. Well, I seen this was awful bad soil and it looked like it was going to cave in.

Q. Did you mention that to Mr. Larson?

A. Yes.

Q. What did he say?

A. He said he didn't know—we just hired out there and we would just go ahead.

Q. Just go ahead digging?

A. Yes.

Q. You and Larson had discussed the texture of the soil?

A. Yes, sir.

Q. Had you mentioned to Larson, or he to you, about it being fill?

A. Yes, we saw that.

Q. You talked that over with Mr. Larson?

A. Yes, sir.

Q. Mr. Ewonuik, where was Mr. Evans when you talked to him?

A. Well, I came over—he was on the east side working on the forms—putting the forms in.

From the foregoing testimony by Ewonuik who was an employee of the defendant Monson, it is clear that Leon Larson, Monson's partner, knew the condition of the soil and that it would endanger the building to continue excavation without taking some measure to prevent probable damage. On the contrary, according to the testimony of the operator who was the employee of the Monson Contracting Company he said "just go ahead digging". Nowhere in his testimony did Larson deny that he made the statement quoted and it therefore stands uncontradicted.

Paul Fossum a witness for the defendant Monson testified that Leon Larson, a partner of defendant Monson was present while the excavation was in progress and that Larson was in the trench to see that it was maintained at the proper level. It must be assumed that Larson saw the loose condition of the soil and should have realized the danger to the adjacent building.

Under the circumstances it clearly was his duty to take some measure to protect the building and its contents or at least to notify the plaintiffs that the soil was caving in so as to afford them an opportunity to take some action to protect their property. In this he failed and on the contrary told the operator to "go ahead and dig". His conduct in this respect certainly constituted negligence.

It is established by the evidence that the defendant Monson agreed with the defendant Peterson to do the excavating for the footings and foundation for the Truscott building. Monson informed his partner, Paul Fossum of this arrangement and Fossum dispatched Leon Larson, also a partner of Monson, and Sylvester Ewonuik, to go with the power shovel to do the excavating work.

The general rule is that the liability of general partners for each other's acts is the same as that of principal and agent. Sec 45-0211 RCND 1943. A principal is responsible to third persons for the negligence of his agent in the transaction of the business of the agency, including wrongful acts committed by such agent in and as a part of the transaction of such business. Sec 3-0309 RCND, 1943.

The defendant Monson would therefore be liable to the plaintiffs for the damages they sustained by reason of the negligence of his partners Paul Fossum and Leon Larson. The defendants Peterson and Monson were jointly engaged in excavating for the Truscott building. Both were negligent, and therefore must be held to be jointly and severally liable for the damages sustained by the plaintiffs.

Where a single injury is suffered as a consequence of the wrongful acts of several persons, all who contribute directly to cause the injury are jointly or severally liable, although there was no conspiracy or joint concert of action between them.

In the case of McDonald v. Robinson, 224 NW 820, 207 Iowa 1298, the Court said:

"There is a large class of cases in which joint liability may exist from which the element of intent and unity of design and purpose is wholly absent. If the acts of two or more persons con-

cur in contributing to and causing an accident, and but for such concurrence the accident would not have happened, the injured may sue the actors jointly or severally and recover against one or all, according to the proven or admitted facts of the case. Boswell & Tovvin v. Gates, 56 Iowa 143, 8 NW 809; Lull v. Anamosa National Bank, 110 Iowa 537, 81 NW 784; McCann v. Clark, 166 Iowa 705, 148 NW 1025; Jahr v. Steffen, 187 Iowa 168, 174 NW 109; Dickson v. Young, 202 Iowa 378, 210 NW 452."

Under the rule stated we hold that since the cause of action in the instant case is based on tort, M. B. Monson is a proper party defendant, notwithstanding he was sued individually.

The defendant Monson contends that he is not a proper party defendant since he was sued individually while the evidence shows that he is a partner in the firm of Monson Contracting Company. In support of this contention he cites the case of Clements v. Miller, 13 ND 176, 100 NW 239. The cause of action in that case arose from breach of contract and the relation of partnership did not exist. The cause of action in the case at bar is based on tort. In tort actions a claimant for damages may sue one, or all, or any combination of the partners.

"The liability of members of a partnership for tort committed in the course of its business is joint and several. On the principle of mutual agency, the partnership, or every member of a partnership is liable for torts committed by one of the members acting in the scope of the firm business although they do not participate in, ratify or have knowledge of such torts. Such liability is not dependent on the personal wrong of the individual member of the partnership against which the liability is asserted. The test of the liability is based on a determination of the question whether the wrong was committed in behalf of and within the reasonable scope of the business of the partnership. If it was so committed, the partners are liable as joint tortfeasors.

"Since partners are liable as joint tort-feasors, the party aggrieved has his election to sue the firm or to sue one or more or its members, and may even single out for suit a partner who personally was in no wise involved in the commission of the

tort. This liability for the tort of a copartner is also binding in equity on the individual assets of such partner in like manner as if the individual liability had arisen from an express contract apart from the contractual relation arising from the partnership.

"A necessary foundation for the liability of partners or the partnership for the tortious act of a copartner is that the act shall be performed in the line of the copartnership business, and if the injury results from a wanton or willful act of one of the parties committed outside the agency or common business then the person doing the act and causing the injury is alone responsible, unless the act which constituted the tort was authorized by the members of the partnership or subsequently ratified by them, the act itself having been done in their behalf and interest." 40 Am Jur § 190, page 261.

"The principles governing the liability of one partner for the torts of his copartners apply to torts based on the negligence of such partner. For example, where several physicians are in partnership, they may be held liable in damages for the professional negligence of one of the firm. And where a firm of physicians assumes the duty of returning a patient, who has been operated on in the operating room of the hospital, to his private room in the hospital, each member of the firm is the agent of the firm while performing that duty, and consequently, the firm is liable for the negligence of a member in its performance, resulting in injury to the patient." 40 Am Jur § 191.

"As a rule, when a partnership is answerable for the tort of any member the liability of the partners is joint and several or as sometimes expressed, in solido, but a partnership or its members may not be held liable for the wrongful act of a partner for which he himself is not liable". 68 CJS § 181, page 636.

In the case of Caplan v. Caplan 268 NY 445, 198 NE 23, 101 ALR 1223 this rule is stated as follows:

"In the field of liability for torts it is especially apparent that a partnership cannot be regarded as an entity independent of the person who compose it. In that field it has been said often that liability is joint and several. Perhaps it would be more accurate to say that the members of a partnership are treated like other persons who jointly commit a tort, either in person

or by the hand of an agent. All may be held jointly for the tort so committed, or each may be sued individually. So we have said that 'the plaintiff may proceed against any one, all, or such number of the wrongdoers as he may choose.' "

"The liability of partners for torts committed by one partner or a servant is joint and several, not joint, as in case of contract. . . . Therefore, it is not necessary in bringing an action to join all the partners, but it may be brought against one partner or all or any number less than all. This joint and several liability of joint tort-feasors is not different from the joint and several liability of parties to a contract. . . ." Rowley Mod. Law Partnership, Vol. 1, § 506, page 642.

Under the principles stated we hold that since the cause of action in the instant case is based on tort, M. B. Monson is a proper party defendant, notwithstanding he was sued individually.

The defendants contend that the evidence does not sustain the amount of damages awarded by the district court, and that the defendants did not take proper measures to secure a building in which to continue their business so as to reduce their damages.

The plaintiffs were out of business approximately six months, from September 6th, 1947 when the Mundy building collapsed, to March 10, 1948, when their new building was completed. The evidence shows that the plaintiffs and Mr. Mundy the owner of the collapsed building, made search for a suitable building in which to continue their business until their new building was completed. They found only two buildings that might be available. One was a display room of an automobile sales agency. It had no water or sewer, no shelving or other facilities necessary for plaintiffs' business. The other building was a frame warehouse with siding front, a dirt floor, no sewer or water connections and was wholly unsuitable for plaintiffs' purpose. To repair either of these buildings and render them suitable for the business of the plaintiffs would require time and entail heavy expenses and it is quite possible that the cost of repairing either of the said buildings, installing the necessary equipment

and stocking with merchandise and shortly remove it to the new building would increase rather than reduce the damages. Furthermore plaintiffs' new building was under construction and they anticipated its early completion. The evidence fairly considered does not warrant the conclusion that the plaintiffs failed or neglected to take such steps as might be necessary to reduce the damages sustained.

Plaintiffs employed an accountant, R. J. Franklin to prepare a comparative operative statement of the plaintiffs' grocery business for the years 1946 and 1947. This statement was introduced in evidence as plaintiffs' exhibit 16 and prepared from the original books and records kept by the plaintiffs and contains an itemized statement of gross profit on sales, net profits and detailed statements of operating expenses from January 1, 1946 to September 6, 1946; from January 1, 1946 to December 31, 1946; from January 1, 1947 to September 6, 1947; from January 1, 1947 to September 31, 1947 and for the six months period from September 6, 1947 to March 10, 1948 when the plaintiffs were out of business due to the collapse of the Mundy building.

This comparative statement shows the items of expense which plaintiffs claim were necessarily incurred during the period they were out of business and had no income. The district court awarded damages to the plaintiffs in the sum of $8489.00 which included all items shown in plaintiffs exhibit 16 to-wit:

| | |
|---|---|
| Loss of profit for six months from Sept. 6, 1947 to March 9, 1948 | $1920.00 |
| Operating loss for the same period | 4524.00 |
| Loss or damage to merchandise and fixtures | 2000.00 |
| Rent for building paid in advance | 45.00 |
| | $8489.00 |

Section 32-0320 RCND 1943 defines the measure of damages for tort as follows:

"For the breach of an obligation not arising from contract, the measure of damages, except when otherwise expressly provided by law, is the amount which will compensate for all the

detriment proximately caused thereby, whether it could have been anticipated or not."

The use of anticipated profits as a measure of damages when they are reasonably certain in character and the loss is the approximate result of a tort, is sustained by the weight of authority.

"As a general rule, the expected profits of a mercantile business are too remote, speculative, and uncertain to sustain a judgment for their loss. In many cases a recovery for the loss of future profits caused by the interruption or breaking up of an established business has been denied on this ground, unless, as stated in certain cases the act which occasioned the loss was malicious. According to the weight of authority, however, a recovery may be had for such losses where they are reasonably certain in character and are the approximate result of either tort or a breach of contract, or where, in case of contract, they may be reasonably supposed to have been within the contemplation of the parties when the contract was made as the probable result of a breach. In cases such as this the damages may be estimated according to the average percentage of mercantile profits. Proof of the gross receipts of the business standing alone, however, is not sufficient. The proof must pass the realm of conjecture, speculation or opinion not founded on facts, and must consist of actual facts from which a reasonably accurate conclusion regarding the cause and the amount of the loss can be logically and rationally drawn.

"To come within the rule, it must be made to appear that the business which is claimed to have been interrupted was an established one which had been successfully conducted for such a length of time and had such a trade established that the profits thereof were reasonably ascertainable. The prospective profits of a new business or enterprise are generally regarded as being too remove, contingent, and speculative to meet the legal standard of reasonable certainty applicable in determining the elements of recoverable damages in an action for breach of a contract or for a tort." 15 Am Jur 573, Sec 157.

In the case of Steiner v. Long Beach Local, 123 Pac 2d, 20, 19 Cal2d, 676, it was held that:

"Where an established business is wrongfully interrupted and injured, the proper measure of damages is the diminution in value of the business traceable to the wrongful act, as reflected by loss of profits, expenses incurred or similar concrete evidence of injury. Lambert v. Haskell, 80 Cal 611, 22 p 327."

To the same effect is the case of Elsbach v. Milligan, 136 Pac 2d 651, Cal App2d 354.

"The measure of damages for the diminution of value of a business due to a wrongful act is reflected by loss of profits, expenses incurred, or similar concrete evidences of injury, and capitalization of past profits in a concrete form of determining one factor of the damages sustained."

During the time plaintiffs were forced out of business by the collapse of the Mundy building they paid their department heads one half of their regular salary amounting to $2597.00 which is included in the item of "Operating loss". As a consideration for the payment of these salaries the department heads agreed to return to their jobs when plaintiffs would be ready to open business in their new building. They had been employed by the plaintiffs for several years, had experience in their respective departments, and were therefore considered to be more valuable to the plaintiffs than others without experience. While perhaps it was good business judgment on the part of the plaintiffs to make such arrangement with their department heads we cannot say that the amount of the salaries paid them is a proper item of damages for which the defendants are liable. It does not appear from the evidence that the plaintiffs were under any contractual or legal obligation to their department heads for the payment of salaries for any specified period of time,—in fact, the plaintiff R. L. Truscott stated on cross examination that these salaries were not legal obligations. Nor is there any testimony in the record that the return of the department heads to their former positions was dependent upon payment of these salaries. No authorities have been cited by the plaintiffs supporting their claim or claims of similar character. We must hold therefore that under the evidence these salaries can not be considered a proper measure of damages.

There are certain other items listed in plaintiffs' exhibit 16, which we feel are not proper items of damages, viz:

Dues and subscriptions ........................ $ 40.00
Heat and water ............................... 25.14
Light and power .............................. 58.49
Freight and drayage .......................... 183.28
Light and power .............................. 28.08
Heat and water ............................... 33.25
Depreciation on buildings .................... 101.10
                                              _____
                                              $469.34

The item "dues and subscriptions" consists of donations to "open your heart" "Crippled children" etc.; the item of "heat and water" were furnished for the new store building; as to the item "freight and drayage", the plaintiffs admitted that it possibly was freight, drayage and express on items for the new building; the item $101.10 "depreciation on buildings" had reference to a building which did not belong to the partnership business. The total amount of these items is $469.34. The item of operating loss $4524.00 should therefore be reduced by $469.34 and $2597.00 leaving it at $1457.66.

The item of $1920.00 is the estimated loss of profit during the period when the plaintiffs were out of business. This sum was arrived at by taking the net profit earned during the eight month period from January 1, 1947 to September 6, 1947, which was shown to be $2563.75 or an average of $320.00 per month. The loss during the six month period the plaintiffs were out of business was arrived at by taking the monthly average for the previous eight months, or $320.00 multiplied by six which would be $1920.00. The item of $2000.00 loss or damage to merchandise and fixtures was arrived at by taking an inventory of the merchandise salvaged and by a conservative estimate of the merchandise damaged or destroyed. The damage to merchandise was $1800.00 and the damage to equipment was $200.00. The item of $45.00 was rent paid in advance to Mundy for the collapsed building.

The total amount of damages to which plaintiffs are entitled

is therefore $5422.66. The case is remanded with directions to modify the judgment accordingly and as modified the judgment is affirmed.

MORRIS, C.J., and CHRISTIANSON, GRIMSON and BURKE, JJ., concur.