**SUPERWOOD CORPORATION, formerly Superior Wood Products, Inc., Appellant,**

v.

**LARSON–STANG, INC., Appellee.**

**No. 17054.**

United States Court of Appeals
Eighth Circuit.

Jan. 7, 1963.

Richard H. McGee, of McGee, Van Sickle & Hankla, Minot, N. D., made argument for appellant and Patrick D. O'Brien, of Johnson, Bruess, O'Brien & Boyd, Duluth, Minn., was with him on the brief.

Dean Winkjer, Williston, N. D., made argument for the appellee and Fred A. McKennett, Williston, N. D., was with him on the brief.

Before JOHNSEN, Chief Judge, and MATTHES and RIDGE, Circuit Judges.

MATTHES, Circuit Judge.

This is an appeal by Superwood Corporation, defendant, from the judgment entered on jury verdict in favor of Larson-Stang, Inc., plaintiff. Jurisdiction rests on diversity of citizenship and the requisite amount in controversy.

During the seven years immediately preceding plaintiff's fiscal year ending April 30, 1961, plaintiff was a building contractor engaged in constructing new houses for sale in Williston, North Dakota.[1] Defendant was engaged in the

1. The principal stockholders [Robert S. Larson and Robert L. Stang] of plaintiff corporation were in the construction business as a partnership from May, 1952, until June 10, 1954, the date on which the company became incorporated.

manufacture and sale of wood products, including "Superwood tempered hardboard siding" for use in surfacing the exterior of new houses. Plaintiff purchased a sufficient quantity of Superwood siding from defendant on nine different occasions between February 18, 1955, and March 28, 1957, to enable plaintiff to side 60 new houses constructed by it during approximately the same period of time.[2]

Plaintiff alleged in its complaint, contended at trial and argues here, that it purchased the siding material from defendant in reliance upon an express or an implied warranty of fitness of the material for the use intended, and that defendant breached the warranty since all of the siding material was defective and expanded, contracted, delaminated, decomposed and swelled after it had been placed on the buildings. For breach of warranty, plaintiff claimed damages for, first, the amount it had paid to defendant for the siding, $15,011.11; the cost of labor in installing the siding on the 60 houses, $8,770.71; the cost of painting the siding on all 60 houses, $6,330; the cost of removing the siding from all 60 houses, $1,223.51; the cost of nails and corners in installing the siding on all 60 houses, $480; and the cost to plaintiff in attempting to repair and repaint defects in the siding, $4,535; or a total of $36,350.33. Second, the loss of profits plaintiff had suffered in the amount of $50,000. Third, the damage to plaintiff's reputation in the amount of $50,000. The jury awarded plaintiff $36,350 on the first item, $10,000 on the second, and $15,000 on the third, or a total of $61,350.

Defendant's motion for directed verdict after the close of the whole case and after-trial motion for judgment not-withstanding the verdict, or, in the alternative, for a new trial, were denied. Defendant prosecutes this appeal, contending that a submissible case was not made and that the court erred in denying its motion for a directed verdict and motion n. o. v. This basic contention presents these specific questions: (1) whether plaintiff is the real party in interest and has standing to maintain this action; (2) whether there was any substantial evidence that the material did not conform to the warranty and was defective when purchased; and (3) whether the evidence to establish plaintiff's damage was too speculative and uncertain to sustain an award for any amount.

At the outset it should be observed that the parties and the trial court apparently were of the view that North Dakota law controlled the disposition of all issues.[3] Section 51–01–13 of the North Dakota Century Code (Uniform Sales Act) provides in part that: "Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon." There was evidence from which the jury could find that defendant had given plaintiff an express warranty within the contemplation of the foregoing statute.

On appeal, defendant's contention No. 1 is predicated largely on the undisputed fact that plaintiff had parted with title to the 60 houses long before this action was tried.[4] From this premise defendant reasons that the owners of the properties are the real parties in interest and that they, and they alone, may maintain an action for damages resulting from the defective material which re-

---

2. One of plaintiff's exhibits reveals that the completion dates of the 60 houses ranged from between July, 1955, and June, 1957.

3. Both parties have cited North Dakota law, and the trial court's instructions were based generally upon local law. Cases from foreign jurisdictions are relied upon by both parties on issues not clearly encompassed within the North Dakota law.

4. It was established that the houses in question together with the real estate upon which they are located were conveyed by plaintiff by warranty deed conveying the usual warranties insofar as title is concerned.

mains on the houses and which has not been replaced by plaintiff. This contention lacks substance and must be denied. Section 51–01–70 of the North Dakota Century Code (Uniform Sales Act) which deals in particular with "[r]emedies of buyer against seller upon breach of warranty," specifically provides that the buyer may, inter alia, "[a]ccept or keep the goods and maintain an action against the seller for damages for the breach of warranty." Additionally, the Supreme Court of North Dakota has defined a "real party in interest" for the purpose of maintaining an action as a person "who has a real, actual, material, or substantial interest in the subject matter of the action," a definition that would clearly seem to encompass plaintiff in this suit. Van Sickle v. McArthur, 110 N.W.2d 281 (N.D.1961). 77 C.J.S. Sales § 352 (1952) announces that a breach of warranty entitles the buyer to maintain an action against the seller for damages, and more specifically, 46 Am. Jur. Sales § 731 provides that "The fact that the buyer has resold the property to a third person in no way affects his right to maintain an action against the seller for breach of warranty." See also Cohan v. Associated Fur Farms, 261 Wis. 584, 53 N.W.2d 788 (1952).

We are not required to and do not consider or decide whether the owners of the houses surfaced by the defective material would, in the absence of privity, have standing to sue defendant, a question which is discussed in the briefs. Our determination is limited to whether plaintiff has the right to maintain this action, a right which unquestionably exists.

■ Defendant's assignment that the evidence was insufficient to establish that the siding material was defective when purchased is utterly lacking in merit. The evidence, viewed in the light most favorable to plaintiff, furnished adequate basis for the jury to find that the expanding and contracting of the siding and the other defects, which became manifest approximately six months after the first purchase was made and after the material had been placed on the houses, resulted because the material was not in accordance with the warranty that was given in connection with the sale.

The question as to the certainty of plaintiff's damages is the crucial issue to be determined on this appeal. Under North Dakota law, the measure of damages for breach of warranty is "the loss directly and naturally resulting, in the ordinary course of events." § 51–01–70(6) North Dakota Century Code (Uniform Sales Act). This rule has received general recognition and application. 1 U.L.A. § 69(6) (Uniform Sales Act); 46 Am.Jur. Sales § 737 (1943); 77 C.J. S. Sales § 374 (1952); Royce Chemical Company v. Sharples Corporation, 2 Cir., 285 F.2d 183, 187 (1960); Superior Combustion Industries, Inc. v. Schollman Bros. Co., 8 Cir., 271 F.2d 357, 363 (1959); Sum Wong v. Hazard, 26 Ill. App.2d 23, 167 N.E.2d 565 (1960); Torrance v. Durisol, Inc., 20 Conn.Sup. 62, 122 A.2d 589, 592 (1956); Stott v. Johnston, 36 Cal.2d 864, 229 P.2d 348, 352, 28 A.L.R.2d 580 (1951); Thurner Heat Treating Co. v. Memco, Inc., 252 Wis. 16, 30 N.W.2d 228, 232 (1947); Schaefer v. Fiedler, 116 Ind.App. 226, 63 N.E.2d 310, 314 (1945).

■ Where breach of warranty of quality forms the basis for the cause of action, the measure of damages in the absence of special circumstances showing the proximate damage of greater amount, is the difference between the value of the goods at the time of delivery to the buyer and the value they would have had if they had been in accordance with the warranty. § 51–01–70(7) North Dakota Century Code (Uniform Sales Act); Motion Pictures for Television v. North Dakota Broadcasting Co., 87 N.W.2d 731, 735, 68 A.L.R.2d 845 (N.D.1958); Boyce v. Fowler, 87 F.Supp. 796, 799 (D.Mass. 1949); 46 Am.Jur. Sales § 738 (1943); 77 C.J.S. Sales § 376 (1952). It becomes apparent from the record that the parties and the court were of the view that the "difference in value rule" was not applicable under the circumstances of this case. On the matter of damages,

the court instructed the jury, "damages for breach of warranty is the loss directly and actually resulting in the ordinary course of events from the breach of warranty, and is not limited to the difference in value of the goods as warranted, but may include as special damages the amount of injury sustained to Plaintiff's business reputation, and profits." We do not understand defendant to contend that the foregoing submission is not a correct abstract declaration of the law, but rather that there is no probative evidence from which the jury could justifiably find that plaintiff had sustained any damages directly and actually resulting from the breach of warranty.

From the record it is evident that the defective siding material did not affect the selling price of the 60 properties, that plaintiff sold all 60 houses and was fully paid therefor, and thus in that regard, that plaintiff suffered no damage. Plaintiff's trial theory amounted to a claim that it was entitled to recover from defendant because of the amount that it might at some future date be required to expend in re-siding all of the 60 houses. In support of this theory, one of plaintiff's officers testified that "we gave essentially the same warranty to the purchasers of these houses as was given to us by the Superwood Corporation," and that "we have assured the owners of these houses that we would have to reside these houses and put them in a satisfactory condition regardless of the outcome of this lawsuit." However, plaintiff had re-sided only 3 houses prior to October, 1961, when this case was tried, and had required each of the three owners to pay plaintiff $550, the apparent cost of re-surfacing each house. The undisputed fact that 21 of the 60 properties have been resold at least once and several as often as three times since plaintiff originally sold them is also of

persuasive significance in considering whether plaintiff has suffered or is reasonably certain to suffer damages as claimed as a result of defendant's breach of warranty.

Plaintiff relies in part and the trial court gave an instruction closely akin to what we shall denominate as the "resale rule." The rule in its broad terms provides that when a warranted article is sold for the purpose of resale, and it is resold with a similar warranty, the first purchaser may recover for breach of the warranty even though he has resold the article, has not refunded any amount of the purchase price, and has had no claim made against him by the subpurchaser. 3 Williston on Sales (rev. ed. 1948), § 614a, pp. 377–78; 77 C.J.S. Sales § 384, p. 1338 (1952); Annot., 64 A.L.R. 883, 894 (1930); Boyce v. Fowler, supra, 87 F.Supp. 796, 799; Elliott-Lewis Corp. v. York-Shipley, Inc., 372 Pa. 346, 94 A.2d 47, 48–50 (1953); Grupe v. Glick, 26 Cal.2d 680, 160 P.2d 832, 838–39 (1945). See also Liberty Mutual Ins. Co. v. J. R. Clark Co., 239 Minn. 511, 59 N.W.2d 899, 904 (1953). While recognizing the validity of this rule and its extensive application to the usual product resale transaction, we are doubtful that the rule is applicable where, as here, the claimed damages arise from use of defective materials in a contractor's business. In such a situation the manufacturer is not the type of seller, the contractor is not the type of purchaser, and the home-owner is not the type of subpurchaser as is contemplated by the rule. More specifically, in the case before us, the siding as warranted by defendant was not resold as such, but it became a component part of the completed unit or structure which was sold.[5] See Annot., 28 A.L.R.2d 591 (1953); Annot., 88 A.L.R. 1439, 1440 (1934); and Annot., 64 A.L.R. 883 (1930), in which a difference is implied

---

5. But see, for example, Tennessee Roofing & Tile Co. v. Ely, 159 Tenn. 628, 21 S.W. 2d 398 (1929), where although the resale rule was not pertinent and was not considered by the court, it was held in a single transaction situation that damages could be recovered for breach of a warranty on building blocks that had become an integral part of a building.

as to "the damages recoverable by a purchaser in case of a breach of warranty of an article purchased for resale and resold, as distinguished from damages arising from the use of defective materials in the buyer's business." Furthermore, there is lack of proof that the siding was "resold with a similar warranty," since the naked, unsupported and conclusory statement that plaintiff would re-side the houses regardless of the outcome of this suit hardly rises to the dignity of proof of the existence of such a warranty between plaintiff and the home-owners. Indeed, the fact that plaintiff required compensation from the three home-owners for which it actually did re-siding, belies the existence of any warranty relationship. We note additionally that four of the property owners testified at the trial in regard to the defects that existed in the siding on their houses, yet not one of them stated that he was looking to plaintiff for correction of the defects or that he had a claim against plaintiff.

◾ Nevertheless, since there are cases with factual circumstances resembling those involved in this case in which the "resale rule" has been applied, we have analyzed the damage issue both in relation to the rule in its broadest form and in relation to the more narrow, and yet more pertinent rule that bases the amount of recovery on the extent of liability contemplated by the parties at the time the contract was made. In F. Hammar Paint Co. v. Glover, 47 Kan. 15, 27 P. 130 (1891), the court held that if a breach of warranty on the part of the seller of paint has involved the purchaser in a *legal liability* to pay money or to incur expense to the parties for whom he did work to relieve himself against the effects of the bad paint, such liability or expense, whether paid or not, constitutes an element of damages which the purchaser is entitled to recover from the warrantor. However, the court attached a further restriction to such a recovery by providing that the purchaser must show that his liability is certain, fixed, or liquidated. To be sure, there is language within the cases that indicates a purchaser may recover from the seller the amount of damages which has either been adjudged due, or which will *probably* be due, to the subpurchaser. See, for example, 3 Williston on Sales (rev. ed. 1948), § 614a, pp. 377–78; Elliott-Lewis Corp. v. York-Shipley, Inc., supra, 372 Pa. 346, 94 A.2d 47, 49–50. In applying this "rule of probability," we have found that whether or not the courts have expressly so stated, they have required a purchaser to show at least that liability to or settlement with a subpurchaser was foreseeable, reasonable, and subject to calculation. Boyce v. Fowler, supra, 87 F.Supp. 796, 799. See also, Sewell Paint & Glass Co. of Texas v. Booth Lumber & Loan Co., 34 S.W.2d 650 (Tex.Civ.App.1930), affirmed, 50 S.W.2d 793 (Tex.Com.App. 1932). Thus, in our view, the determinative factor in this case centers not upon the resale rule in its entirety or upon the extent of liability contemplated by the parties, but rather upon the certainty of the damage to plaintiff since even if it could be found that defendant's breach resulted in a clearly contemplated liability of plaintiff to the subpurchasers, there is no evidence as to how much of the defective siding, if any, plaintiff will be legally required to replace.[6]

◾ Specifically, there is insufficient proof both as to whether plaintiff has any legal obligation to the home-owners and as to whether, even if such legal obligation exists, the liability is certain or fixed. Other than the amounts already actually expended by plaintiff in an attempt to correct the defective siding and the one legal action now pending against

6. In Farrey's Inc. v. Supplee-Biddle Hardware Co., 103 F.Supp. 488 (E.D.Penn. 1952) and Karzen v. Heitzmann, 86 N.W. 2d 514 (N.D.1957), two cases involving different factual circumstances than this case and yet both concerned with a seller's breach of warranty, the courts refused to allow the purchaser to recover from the seller since it was not shown that the purchaser suffered any damage, the loss being absorbed by the subpurchaser.

it by a home-owner, the evidence is inadequate to afford any basis for holding that plaintiff has replaced or will ever be required to replace the defective siding or incur any further expense as a result of defendant's breach of warranty. There is no evidence to indicate that any other of the 60 home-owners could or would bring action against plaintiff, that *all* of the siding on *all* of the houses would be subject to such claims if made, or that plaintiff would be required to make such repairs before any applicable statute of limitations might bar the homeowners' alleged claims. In essence, there is no showing that any recovery by plaintiff other than the $4,535 for actual expenditures would amount to anything more than a windfall. As the Superior Court of New Jersey stated in Somerville Container Sales v. General Metal Corp., 39 N.J.Super. 348, 120 A. 2d 866 (1956), modified, 39 N.J.Super. 562, 121 A.2d 746 (1956):

> "Since many contingencies may in fact avert or reduce the ultimate satisfaction of the subvendee's claim by the plaintiff, notwithstanding a current recovery inclusive thereof, the rule [allowing recovery by purchaser against seller if "probable liability" to the subvendee can be established] has been viewed with some concern * * *. While a degree of uncertainty in jury assessment of damages is frequently inevitable and practically unavoidable * * * yet the jury ought to have such help as the court can give it in this kind of case. * * * It goes without saying that the court should also instruct the jury with respect to the law applicable to the subclaim and require it to determine, on the facts adduced, and after consideration of the factors aforesaid, what the reasonably probable accountability of the plaintiff to the subpurchaser will be, and to allow that amount and no more in its assessment of the plaintiff's damages." 120 A.2d at 872–873.

We believe that the jury in this case was not given the assistance it needed, but was allowed to enter the realm of speculation and conjecture.

A purchaser may recover damages for lost profits where a breach of warranty by the seller precludes the purchaser from gaining anticipated profits, where such damages may reasonably be supposed to have been within the contemplation of the parties at the time when the warranty was made as a probable result of a breach thereof, and where the amount of the loss of profits may be determined from the evidence with reasonable certainty. 46 Am.Jur., Sales § 743 (1943); Truscott v. Peterson, 78 N.D. 498, 50 N.W.2d 245, 257 (1951); Grupe v. Glick, supra, 26 Cal.2d 680, 160 P.2d 832, 839.

To sustain the jury's award of $10,000 for loss of profits, plaintiff, pointing to the only favorable evidence on this issue that was before the jury, argues that of the 28 houses constructed in Williston, North Dakota, in the year 1960, plaintiff only built 3, whereas if plaintiff had maintained the same ratio that existed in the construction of houses in Williston in 1956, 1957, and 1958, it would have constructed 14. Plaintiff reasons that since its profit was $1,197 per unit during the three prior years mentioned, it lost a profit of $1,197 on each of the 11 houses it did not build in 1960. The fatal weakness of plaintiff's position is that there was no probative evidence from which the jury could reasonably find that plaintiff's construction of houses during the year 1960 declined as the proximate result of its use of the defective material in houses that were constructed three to five years before 1960. Logic and common knowledge dictate that elements and factors over which defendant had no control and for which it was not responsible, could have brought about the decline in plaintiff's business. Indeed, the uncontradicted evidence was that in 1960 the construction business "was down" in Williston and "all over the nation." Moreover,

and equally significant, is the fact that for plaintiff's three fiscal years ending April 30, 1957, April 30, 1958, and April 30, 1959, its sales and profits did not decline.[7]

We have also considered the evidence showing that of the 41 houses plaintiff constructed in 1959 it was able to sell 27 and that 14 were transferred to the rental account, but cannot agree that this circumstance fortifies the validity of the standard adopted by plaintiff to establish loss of profits. Obviously the 1959 houses were not surfaced with Superwood siding and the evidence does not establish any connection between defendant's breach of warranty and the failure of plaintiff to dispose of the 14 houses. Without such evidence it may be reasonably inferred that the carry-over of the 14 houses into 1960 accounts for plaintiff's building activity being curtailed in that year.

Our careful analysis of the record, viewed in the light most favorable to plaintiff, convinces us that the evidence left too much to the realm of speculation and conjecture and that it was wholly insufficient to present an issue of fact from which the jury could determine with reasonable certainty whether plaintiff had sustained any loss of profits.[8]

Recovery of damages for loss of business reputation, sometimes referred to as loss of good will, resulting from breach of warranty, has been upheld in some jurisdictions. In 77 C.J.S. Sales § 382 (1952), the general statement appears that "damages for injuries to trade or business may be recovered where they are the proximate result of the breach and were within the contemplation of the parties." Plaintiff relies upon the foregoing authority and upon Stott v. Johnston, supra, 36 Cal.2d 864, 229 P.2d 348, 28 A.L.R.2d 580, and Grupe v. Glick, supra, 26 Cal.2d 680, 160 P.2d 832.

Defendant tacitly concedes that under proper facts damages may be recovered for loss of business reputation, but asserts that the evidence is wholly insufficient to bring this case within that rule.

Damages for loss of business profits and damages for loss of business reputation are, in our view, so closely intertwined and related to each other that it is extremely difficult, without duplication of claims, to establish by probative evidence the existence of both in the same case. In Sol-O-Lite Laminating Corp. v. Allen,

7. An exhibit offered by plaintiff, apparently prepared by its certified public accountant, reflects these interesting figures: Plaintiff had gross sales for the years ending as follows:

| | |
|---|---|
| April 30, 1955, | $434,499.19 |
| April 30, 1956, | 428,512.94 |
| April 30, 1957, | 572,258.42 |
| April 30, 1958, | 594,247.58 |
| April 30, 1959, | 681,955.53 |
| April 30, 1960, | 481,741.27 |
| April 30, 1961, | 124,862.37 |

Plaintiff had gross profits for the years as follows:

| | |
|---|---|
| April 30, 1955, | $ 42,608.19 |
| April 30, 1956, | 71,972.67 |
| April 30, 1957, | 82,557.35 |
| April 30, 1958, | 81,403.64 |
| April 30, 1959, | 106,322.20 |
| April 30, 1960, | 95,827.95 |
| April 30, 1961, | 24,513.80 |

The combined salary and bonuses paid to Larson and Stang individually during those years is as follows:

| | |
|---|---|
| April 30, 1955, | $ 25,630.79 |
| April 30, 1956, | 27,404.85 |
| April 30, 1957, | 39,176.39 |
| April 30, 1958, | 31,181.14 |
| April 30, 1959, | 50,321.97 |
| April 30, 1960, | 44,000.00 |
| April 30, 1961, | 24,000.00 |

8. The court instructed the jury that among the issues to be determined were:

"Was there damage to the business reputation of Larson-Stang, Inc.?

"Was there loss of profit to Larson-Stang, Inc.?"

The jury was submitted interrogatories in which it was generally charged to find what amount, if any, plaintiff was entitled to recover for loss of profits and damage to reputation. In the only other specific reference to either loss of profits or damage to reputation, the court charged that damages for breach of warranty "may include as special damages the amount of injury sustained to Plaintiff's business reputation, and profits."

While not directly an issue on this appeal, we believe that the charge gave the jury a roving commission to speculate as to questions upon which the jury was entitled to have more specific guide lines.

223 Or. 80, 353 P.2d 843 (1960), the Supreme Court of Oregon considered this question, and held:

" * * * Loss of profits for breach of warranty on an article purchased for resale contemplates only the loss of profits on the defective article actually purchased, in this case the loss of profits on those rolls of 48″ plastic which were defective. It does not cover the profits he might have made on similar plastic he would have sold in the future or loss of profits on other items he would have sold had his customers not become disgusted with him. These are losses which *tend to prove damage to good will.* By submitting such a figure to the jury as a separate item under the term 'loss of profits' in addition to the claim for damages to good will, there was a duplication of claims for damage." (Emphasis supplied). 353 P.2d at 849.

However, Isenberg v. Lemon, 84 Ariz. 340, 327 P.2d 1016 (1958) modified 84 Ariz. 364, 329 P.2d 882 (1958), indicates that there is a distinction between loss of future business profits and loss of good will, and that damages may be allowed for both.

Assuming that the North Dakota Supreme Court would hold that a distinction exists and that both loss of profits and loss to business reputation constitute recoverable items of damage in one action, we are nonetheless convinced that the evidence of loss of business reputation in this case is too nebulous, uncertain and speculative to sustain the verdict of $15,000. The jury did not have any qualitative and probative evidence on which to base a determination that plaintiff's good will or reputation as a building contractor had been adversely affected. In fact, as shown in our discussion on the issue of loss of profits, the evidence reflected that plaintiff's business had increased following the events giving rise to this action.

██ Although the evidence was insufficient to permit the jury to award plaintiff damages for any amount other than the item of $4,535, we have concluded that, in the interests of justice, and in order that plaintiff may be afforded another opportunity to prove by proper evidence that it has sustained other damages, the cause should be remanded for another trial on all issues.

Defendant also assigns as error the refusal of the court to permit its expert witness to testify that the paint was defective on portions of the exterior other than the siding, and the refusal of the court to give certain offered instructions. In view of the conclusions we have hereinabove reached, it is entirely probable that on another trial defendant will find it unnecessary to again offer the excluded testimony and the instructions that were refused. Therefore we pretermit consideration of these assignments.

The judgment is reversed, and the cause is remanded.