[S. F. No. 18222. In Bank. Mar. 30, 1951.]

REO D. STOTT, Respondent, v. THOMAS JOHNSTON, Appellant.

Hill, Farrer & Burrill, Hill, Morgan & Farrer, Elliott H. Pentz and David A. Thomas for Appellant.

Frederick L. Hewitt, Edward E. Heavey and Robert L. Dreyfus for Respondent.

SPENCE, J.—Alleging a breach of warranty by reason of the sale of defective paint for use in his business, plaintiff, a painting decorator, recovered judgment upon a verdict against defendant Thomas Johnston, doing business as Johnston Paint Company, in the sum of $10,000. On appeal, defendant argues: (1) that the evidence was insufficient to establish any liability on the part of defendant; and (2) that the evidence was insufficient to sustain the amount of damages awarded. An examination of the record in the light of applicable principles of law leads to the conclusion that the judgment should be affirmed.

Plaintiff, a painting contractor of some ten years' experience, had been engaged continuously in the business of painting houses in Alameda County since January, 1945. One Jack Hendricks, salesman for defendant, called upon plaintiff in February, 1946, for the purpose of interesting him in the use of Pervo paints. At that time plaintiff told Hendricks that he was using "Rich paint," and Hendricks replied, "We have as good a paint, if not better." Wanting some assurance with respect to the quality of Hendricks' paint, plaintiff testified that he asked Hendricks about the "company policy" in the event of "any paint going bad at any time," and that Hendricks replied, "We would reimburse you a hundred percent for labor and materials for any paint that goes bad"; "If anything went wrong with it, they would stand behind me one hundred percent." Thereupon plaintiff purchased paint from Hendricks and during the following months painted some

50 residences and buildings with Pervo "Fume Proof" paint. Plaintiff prepared and applied the paint as he was instructed by Hendricks. In June, 1946, plaintiff reported to Hendricks that the paint "didn't seem to cover as well as it should." Hendricks checked one of the jobs that plaintiff had completed and said that the paint used "didn't contain enough pigment." Thereafter the company purportedly improved the quality of the paint by adding more pigment and plaintiff continued to buy it.

In about October, 1946, plaintiff began to receive complaints from customers whose buildings had been painted with the Pervo "Fume Proof" paint. He took Hendricks and Johnston to one of the buildings and after examining the job, Hendricks stated that there was "definitely something wrong with the paint." Johnston also agreed that there was "something wrong with it," and proceeded to explain to plaintiff and the owners of the building that it was not plaintiff's fault that the paint was cracking and peeling off the walls, but that plaintiff had just received "a bum patch of paint." Johnston further stated that his company would "stand behind [the] job," and told plaintiff to "do it over," giving him precise instructions as to how and when it should be done.

With the beginning of the year 1947, plaintiff received more and more complaints. He testified that about March, 1947, he reported to Hendricks that many of his customers were complaining "on this paint peeling" on their jobs, and that Hendricks replied, "I know the paint is no good, but I would appreciate it . . . if you wouldn't go telling it around town that our paint is no good, because it would hurt my sales terrible." About two weeks later, Hendricks told plaintiff that Johnston "just got back from Los Angeles," where he had a "talk with the Pervo Company," and that "they have O.K.'d to go ahead and do these jobs all over as they come in." However, plaintiff was told to get in touch with Hendricks or Johnston before redoing any job, so that they could first "verify each and every job." Hendricks and plaintiff agreed that Johnston would pay plaintiff $3.50 an hour for the labor to clean and paint the jobs.

About April 5, 1947, plaintiff returned to the Johnston Paint Company all the Pervo paint that he had in stock, some 276 gallons. At about the same time, plaintiff told Hendricks that he had received complaints on about 20 jobs. Hendricks then said that he did not know "whether the company will

stand good for'' that many, and told plaintiff that he would have to discuss the matter with Johnston.

Plaintiff testified that in August, 1947, Johnston told him that the company would stand behind him ''one hundred percent.'' In October, 1947, plaintiff telephoned Johnston at his Berkeley store and told him that he [plaintiff] had ''a lot more complaints . . . about 40'' and he wanted something done about it. Johnston replied that the company ''can't stand for that'' and declared, ''I don't intend to maintain your jobs.'' Pursuant to their arrangement then made, Johnston went with plaintiff on November 4, 1947, to inspect the jobs. They looked at the first house, Johnston ''walked over to a window sill . . . scratched off the paint,'' and then admitted that it was ''definitely over-pigmented.'' Plaintiff then told Johnston that he had painted a number of houses with that same paint, that ''if it is over-pigmented, all these houses will start peeling off like this one'' and his business reputation would be ruined. Johnston replied that he would ''take care of'' the people who sued, and not to worry about the rest, as people forget very easily and plaintiff's reputation would not be damaged in any way. Dissatisfied with Johnston's apparent indifference as to plaintiff's undertaking with his customers, plaintiff threatened to sue Johnston. Then plaintiff suggested that they look at some more of the jobs if Johnston had any doubt as to the importance of plaintiff's having customers satisfied with the work, and the men proceeded on their round of inspection. At the next stop, Johnston again agreed and stated to the owner that the paint was ''a poor batch,'' and that it was ''not [plaintiff's] fault.'' But from then until the tour was completed, Johnston visibly changed his attitude. Upon their inspection of each job thereafter, he told plaintiff that the trouble lay in ''surface condition,'' and that the houses plaintiff was painting were so old that they were not worth painting and ''should be burned down.''

Plaintiff testified that at the conclusion of their tour of inspection, he told Johnston that he wanted the jobs done over and $20,000 damages, and that Johnston just laughed and said, ''We might give you $5,000 and pacify these people, but we sure wouldn't give you twenty.'' Plaintiff then threatened to sue, and Johnston said, ''Now, we don't have to go into that. We will call in the license inspector and if the license inspector says we are wrong, we will stand good for the jobs.'' Plaintiff immediately agreed to the proposal to ''leave it up to the license inspector.'' About two weeks later

Johnston told plaintiff over the telephone that the state license inspector had checked several of the jobs and said that the trouble was "surface condition." Upon making inquiry, plaintiff discovered that Johnston had never communicated with the state license board. Plaintiff then asked the board to have the jobs checked. After plaintiff received the board's report, he telephoned Johnston and told him of its finding that he [plaintiff] "wasn't responsible for the paint failures on [the] buildings," and asked Johnston to make good on his promise. Johnston refused, said that he was "not going to do anything" and told plaintiff to "go ahead and sue."

Plaintiff brought this action for breach of warranty, seeking damages upon these three claims: (1) $5,468.15, representing $6,185, the amount plaintiff paid for the allegedly defective paint, less a credit of $716.85 for the return of the paint not used; (2) $50,000, as the cost necessary to repaint the buildings he had painted with defendant's defective paint; and (3) $40,000, for the loss of customers and good will. On the trial, at the conclusion of plaintiff's case, counsel and the court, in chambers outside of the presence of the jury, discussed the subject of recoverable damages. The court stated that in its opinion there was no basis for recovery on the first two items. Accordingly, only the third item of loss, the issue of damage to good will, was submitted to the jury, and it returned the verdict of $10,000 damages against defendant Johnston.

In denial of his liability, defendant first contends that the alleged statements of Hendricks and Johnston were not express warranties but only amounted to "puffing talk." To that point he cites *Steen* v. *Southern California Supply Co.,* 74 Cal.App. 265 [239 P. 1098]. That case is clearly distinguishable as it involved only general "puffing" statements concerning quality, unaccompanied by any definite promises. ▮▮ Here, on the contrary, Hendricks not only gave assurance as to the high quality of the paint but promised that defendant would reimburse plaintiff "a hundred percent for labor and materials for any paint that goes bad" and that "[i]f anything went wrong with it, they would stand behind [plaintiff] one hundred percent." Plaintiff testified that he wanted "an assurance" before changing from the paint which he was using to defendant's paint, and that it was the receipt of this assurance which prompted him to try the Pervo paint. (*Cf. Chamberlain Co.* v. *Allis-Chalmers Mfg. Co.,* 74 Cal.App. 2d 941, 943 [170 P.2d 85].)

▮▮ "Any affirmation of fact or *any promise* by the seller

relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. No affirmation of the value of the goods, nor any statement purporting to be a statement of the seller's opinion only shall be construed as a warranty." (Civ. Code, § 1732, part of the Uniform Sales Act, Stats. 1931, pp. 2234, 2238; emphasis added.) Under this section no particular words are necessary to create a warranty, and whether the word "warrant" was used in the parties' dealings is immaterial (*Chamberlain Co.* v. *Allis-Chalmers Co.*, 51 Cal.App.2d 520, 522 [125 P.2d 113]; *El Zarape Tortilla Factory, Inc.* v. *Plant Food Corp.*, 90 Cal.App.2d 336, 345 [203 P.2d 13]); and such was the rule established long before the adoption of the Uniform Sales Act. (*Cole* v. *Weber* (1924), 69 Cal.App. 394, 397 [231 P. 353].) ▮▮▮ As the record here stands, the conclusion seems inescapable that the statements of defendant and his salesman, Hendricks, constituted an express warranty; indeed it would be difficult to conceive of a clearer instance of a buyer being induced to buy upon the representations of a seller. (See Williston on Sales, rev. ed., vol. 1, § 194, p. 498.) Accordingly, there is no merit to defendant's attack upon the sufficiency of the evidence as to his liability in this respect.

In view of our conclusion that defendant's liability may be sustained by reason of his breach of an express warranty, it becomes unnecessary to discuss plaintiff's further claim that defendant's liability might likewise be predicated upon the breach of an implied warranty. (Civ. Code, § 1735.)

There now remains for consideration defendant's contention that the evidence as to damages is insufficient to support the judgment. In testing the propriety of plaintiff's recovery, these provisions of section 1789 of the Civil Code are pertinent: "(6) The measure of damages for breach of warranty is the loss directly and naturally resulting in the ordinary course of events from the breach of warranty; (7) In the case of breach of warranty of quality, such loss, in the absence of special circumstances showing proximate damage of a greater amount, is the difference between the value of the goods at the time of delivery to the buyer and the value they would have had if they had answered to the warranty."

Defendant first argues that as a matter of law, there can be no recovery for loss of business good will in that such item is regarded as "too remote, uncertain and speculative."

■ However, there is ample authority sustaining the allowance of such element of damage where shown by the evidence as "flowing from the use of unfit material received from one who warranted it to be fit" (*Royal Paper Box Co.* v. *Munro & Church Co.*, 284 Mass. 446 [188 N.E. 223, 225], and numerous cases there cited; *Cramerton Mills* v. *Nathan & Cohen Co.*, 231 App.Div. 28 [246 N.Y.S. 259, 267-268], and cases cited), and the applicable provisions of the code above quoted appear to sustain such recovery if there is evidentiary support therefor. Here, upon submitting the damage issue to the jury, the court defined "good will of a business . . . as the expectation of continued public patronage." (See Good Will, Def., 38 C.J.S. § 1, p. 948.) It is not open to argument that the sale of defective paint to a successful painting contractor—which results in his painting 50 or more houses and buildings with the paint and it then begins to "peel, crack, discolor, powder and come off" within six months or less—can do serious harm to his reputation as a painting contractor in that particular community.

The record shows that plaintiff was using the "Rich" paint in his painting business and was satisfied with it; that defendant's salesman, Hendricks, told plaintiff that defendant's paint was "the best money [could] buy," that it was "as good . . . or better" than the paint plaintiff was using, and that "if anything went wrong with it, they would stand behind [him] one hundred percent." The record also shows, as above recited, that defendant's paint was admittedly defective. However, despite these factors indicating defendant's liability to plaintiff for breach of warranty in the sale of the paint in question, defendant argues that he is not subject to damages for any loss of good will plaintiff may thereby have sustained because such damages were not contemplated by the parties in their dealings. To this point defendant claims that it was expressly agreed that defendant's liability should extend no further than reimbursement for "labor and materials needed to do over any jobs involving defective paint." As embracing analogous considerations in the measure of recoverable damage for breach of warranty, defendant relies on the general rule that compensation for the detriment occasioned by the loss of future profits may be allowed only where such damages "may fairly be supposed to have entered into the contemplation of the parties when they made the contract." (*Grupe* v. *Glick*, 26 Cal.2d 680, 688 [160 P.2d 832]; also, *Morello* v. *Growers Grape Prod. Assn.*, 82 Cal.

App.2d 365, 375 [186 P. 463]; *Hoag* v. *Jenan,* 86 Cal.App.2d 556, 564 [195 P.2d 451].) ▮ However, the record here plainly indicates that the parties did in fact contract in contemplation of plaintiff's maintenance of his then existing business good will, coincident with plaintiff's emphasis upon the "satisfactory results" that he had been having with the "Rich" paint but, in view of his need for paint to do the many jobs that he at the time had under contract, agreeing to purchase defendant's paint pursuant to Hendricks' assurance that it was "as good a paint or better" than that which plaintiff was using. Moreover, Hendricks' statement that the company "would stand behind [plaintiff] one hundred percent" if anything went wrong with the paint, indicates that Hendricks fully apprehended that plaintiff's use of a defective paint would entail a loss of business good will. When such statement was made, Hendricks knew the particular purpose for which plaintiff bought the paint and the latter's reliance on his judgment as to its quality in obtaining satisfactory results. In such circumstances, it is reasonable to conclude that damages for the loss of good will were within the contemplation of the parties as a detriment "directly and naturally resulting" from the breach of warranty, and plaintiff's right to an appropriate allowance for such loss is not open to dispute. (*Cf. Cramerton Mills* v. *Nathan & Cohen Co., supra,* 246 N.Y.S. 259, 268.)

▮ The question then arises as to the state of the evidence in support of the damage award for plaintiff's loss of good will. Plaintiff's accountant testified that the following figures accurately represented plaintiff's earnings for the years 1946-1948:

| *Years* | *Gross Income* | *Net Profit* |
|---|---|---|
| 1946 | $65,317.83 | $2,865.92 |
| 1947 | 78,514.31 | 4,428.88 |
| 1948 | 76,258.66 | 4,920.17 |

It thus appears that plaintiff's gross income showed a decided increase in 1947—some $13,000 or approximately 20 per cent—coincident with the postwar building boom, but in 1948 there was a decrease of more than $2,000; and that plaintiff's net profits increased in 1947 nearly $1,600 as contrasted with an increase of but $500 for the succeeding year, when the repercussions from the many complaints received by plaintiff on his paint jobs began to be felt. These figures assume particular significance in the light of plaintiff's testimony concerning his efforts to expand his business during

this critical period; his expenditure in 1946 and 1947 of $8,000 for advertising, including the distribution of cards in the neighborhood where a particular job was being done, inviting "the people . . . [to] come over and look at [the] work, inspect [the] workmanship"; his purchase of new equipment in the same two years for $40,000, including three new trucks, compressors and spray outfits, and then his inability to keep even "half of it" in use as "the complaints [kept] coming in on [the] jobs"; his hiring of three additional salesmen in 1947 to solicit business along with himself, and their leaving of his employ as business dwindled. Such evidence shows that despite plaintiff's obviously increased business capacity, efficiency and promotion activities to take advantage of the postwar building and construction boom, his efforts were of no avail; that in 1948, when it would be reasonable to assume that the business earnings would reflect a decidedly favorable return from plaintiff's previous two years' outlay of expense, the gross income, rather than increasing in the same proportion as it did from 1946 to 1947—20 per cent, which would have brought the gross business for 1948 to some $90,000—did, in fact, decline some $2,000 as compared with 1947; and the net profits, instead of advancing in a manner comparable to the $1,600 gain shown for 1947 over 1946, did, in fact, increase but $500 over 1947. In discounting this evidence of plaintiff's experience of a decline in his business earnings, defendant argues that plaintiff simply over-expanded his business in the vain hope that it would "skyrocket," and that the failure of the anticipated volume of business to materialize cannot be charged to damage done to plaintiff's reputation as a painting contractor by reason of the use of defendant's paint in the preceding years. Defendant also cites in this regard plaintiff's admission, upon cross-examination, that he had some business losses in 1947 and 1948 because of "trouble . . . with the unions." In explanation of this latter testimony, plaintiff, on redirect examination, stated that this union trouble was confined to "one instance." These were all simply instances of conflicting evidentiary considerations for the jury to resolve in the determination of plaintiff's right to recover damages for the alleged loss of good will. In such circumstances, there need be no citation of authority for the proposition that the jury's rejection of defendant's views and acceptance of plaintiff's claim are conclusive on this appeal.

However, in a case of this kind there must be recognized

the difficulty in the proof of damages put upon the plaintiff, and there seems to be no prescribed pattern of precisely what evidence should be introduced. Aptly illustrative of the problem posed in a case closely parallel in facts affecting the recovery of damages for loss of good will is *Barrett Co.* v. *Panther Rubber Mfg. Co., First Circuit (Mass.)*, 24 F.2d 329. It there appeared that plaintiff manufactured rubber heels and it purchased from defendant a certain composition or material to be used in its manufacturing business. Defendant, as seller of the raw material, knew that the heels were to be resold in the course of plaintiff's business. In such manufacture and sale over the years, plaintiff "had acquired a valuable business good will, had spent large sums of money in advertising, and had established a valuable reputation for rubber heels under the brand and tradename of 'Panther.'" (P. 331.) A latent defect in the material rendered the heels unmarketable. Action was brought for a breach of warranty, and the Circuit Court of Appeals affirmed a judgment in favor of plaintiff, the buyer, which included $20,000 as damages for loss of good will. In so holding, the court said at page 337 : "It appears that, as the result of defendant's action, the plaintiff put out to the trade about three-quarters of a million dollars worth of heels which proved unmerchantable. These heels were largely scattered in the trade, to the lasting detriment of the reputation of plaintiff's product. It is not necessary that damages of this kind, in order to be recoverable, shall be capable of calculation with mathematical accuracy; these elements may be determined by approximation. (Citing cases.) After a careful study of the proofs on this subject (plaintiff's records of earnings over the years), we think there was no error in the allowance to the plaintiff of $20,000 for the loss of good will." (See, also, *Cramerton Mills* v. *Nathan & Cohen Co., supra,* 246 N.Y.S. 259, 268-269.)

While a recovery for loss of good will was denied in *Armstrong Rubber Co.* v. *Griffith, Second Circuit (New York),* 43 F.2d 689, with the statement at page 690 that "knowledge that the goods are to be resold and, if defective, will be the occasion of a loss of profits is not enough to justify an award of special damages," such declaration was made in connection with a claim for damages on a sale of goods "to be used for the general trade" (p. 691) rather than for a particular purpose, the situation in the distinguished Barrett case. (See *Czarnikow-Rionda Co.* v. *Federal Sugar Refining Co.,* 255 N.Y. 33 [173 N.E. 913, 88 A.L.R. 1426], and cases collected

in 88 A.L.R. 1439; *Architector Co.* v. *Slomon,* 80 N.Y.S.2d 590, 594.) ■ The Armstrong case follows the general principle that the seller's liability for damages must be worked out on terms which may reasonably be supposed to have been within the contemplation of the parties (Williston on Sales, rev. ed., vol. 3, § 614 et seq., p. 371 et seq.; *Globe Refining Co.* v. *Landa Cotton Oil Co.,* 190 U.S. 540, 544 [23 S.Ct. 754, 47 L.Ed. 1171]; *Moran* v. *Standard Oil Co.,* 211 N.Y. 187 [105 N.E. 217, 220]), and no such indemnification against loss of good will may ordinarily be deemed an element of recovery where articles are sold as merchandise for general purposes rather than "for a particular purpose" which is known by the seller at the time of sale and where "it appears that the buyer relies on the seller's skill or judgment." (*Armstrong Rubber Co.* v. *Griffith, supra,* p. 691.) ■ In the latter situation of sale "for a particular purpose," it would be unrealistic to say that the buyer's dealings with his customers were not in the contemplation of the seller, and accordingly, under such circumstances, the seller's liability for damages shown to have been suffered by the buyer through an injury to his business and good will should be sustained. (*Cramerton Mills* v. *Nathan & Cohen Co., supra,* 246 N.Y.S. 260, 269.)

The propriety of the allowance of $10,000 to plaintiff for the loss of good will must be considered in relation to the nature of the evidence available to plaintiff in proof of this issue. Analogous considerations have arisen in cases where recovery for loss of future profits was sought, and the courts have been reluctant to reverse a reasonable damage award because the precise amount of damage was not definitely ascertainable. ■ In this regard it appears to be the general rule that while a plaintiff must show with reasonable certainty that he has suffered damages by reason of the wrongful act of defendant, once the cause and existence of damages have been so established, recovery will not be denied because the damages are difficult of ascertainment. (See anno. 78 A.L.R. 858; 25 C.J.S. § 28, pp. 493-496.) ■ In *Grupe* v. *Glick, supra,* 26 Cal.2d 680, it was declared at page 692, upon the citation of numerous authorities that "where the operation of an *established* business is prevented or interrupted, as by a tort or breach of contract or warranty, damages for the loss of prospective profits that otherwise might have been made from its operation are generally recoverable for the

reason that their occurrence and extent may be ascertained with reasonable certainty from the past volume of business and other provable data relevant to the probable future sales.'' (Emphasis added.)

Comparable considerations arose in the application of this principle in the case of *Hoag* v. *Jenan, supra,* 86 Cal.App.2d 556, where plaintiff sought damages for defendant's breach of contract in failing to complete a specified building within the scheduled time, and so prevented the expansion of plaintiff's business as contemplated at the time of their agreement. Plaintiff recovered judgment for $15,000. In upholding such damage award, the court observed at page 564 that plaintiff's business was ''in actual operation, its past experience has demonstrated the success of the enterprise, and provides a reasonably certain basis for the ascertainment of the probable loss consequent upon the breach of contract to complete the annex within the time specified.'' The only additional evidence appearing in that case as compared with the present record is the fact that plaintiff was forced to turn away prospective customers because of defendant's failure ''to provide [plaintiff] with the necessary space in which to expand his operations.'' (P. 560.) Here plaintiff has shown his records of past earnings in his established business, his sizable financial outlay for additional equipment in anticipation of an increase in his painting work coincident with the postwar building boom, and his expenditure of a considerable sum in promotional activities commensurate with the facilities of his theretofore growing business. While plaintiff did not introduce any evidence as to loss of specific customers by reason of his use of defendant's defective paint in his business, it is readily arguable that such item of proof may not have been available to plaintiff by reason of the particular nature of his mode of operations as contrasted with another type of business, such as was involved in the Hoag case. Under all the circumstances here, it is difficult to see what additional evidence plaintiff could have introduced on the damage issue. The law only requires that the best evidence be adduced of which the nature of the case is capable (*Steelduct Co.* v. *Henger-Seltzer Co.,* 26 Cal.2d 634, 651 [160 P.2d 804]), and the defendant whose wrongful act gave rise to the injury will not be heard to complain that the amount thereof cannot be determined with mathematical precision. (*Hacker Pipe & Supply Co.* v. *Chapman Valve Mfg. Co.,* 17 Cal.App.2d 265, 267 [61 P.2d 944].) As the record here

stands, defendant's objection to the damage award is without avail.

Under all the circumstances showing the extent of plaintiff's injury by reason of defendant's breach of warranty, it is clear that the award of $10,000 is a reasonable determination of the damage sustained by plaintiff, and that any error on the part of the trial court in restricting the assessable items to the single issue of loss of good will, as above noted, reacted to defendant's benefit. ■■ In this regard, plaintiff now urges that the judgment in his favor be increased by the amount of $5,468.15, being the sum paid for the defective paint used, a matter of loss "clearly proven with certainty" and "tacitly admitted by defendant." However, since plaintiff did not appeal from the judgment, the requested modification must be denied. (2 Cal.Jur. § 492, p. 839; *Richardson* v. *Suiter*, 74 Cal.App.2d 682, 688 [169 P.2d 252]; *Hill* v. *Hill*, 82 Cal.App.2d 682, 702 [187 P.2d 28]; *Noble* v. *Noble*, 83 Cal.App.2d 775, 778 [189 P.2d 502].)

The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Schauer J. concurred.