327 P.2d 1016

**William ISENBERG et al., Appellants,**

**v.**

**Walter LEMON, dba Red Lemon Colors, Appellee.**

**No. 6376.**

Supreme Court of Arizona.

July 15, 1958.

As Amended on Rehearing Sept. 24, 1958.
See 329 P.2d 882.

Burton Lewkowitz, and John B. Marron,. Phoenix, for appellants.

Hughes & Vinson, Phoenix, for appellee.

PHELPS, Justice.

This appeal was filed by William Isenberg and wife and Lionel Isenberg and' wife dba Prudential Chemicals Manufacturers, from a judgment against them; in favor of Walter Lemon dba Red Lemon Colors in the sum of $31,800. The appellants will hereinafter be designated as. Isenbergs or the Isenbergs and the appellee as Lemon.

In December 1953 and early in 1954 Lemon entered into verbal agreements with a number of paint contractors in Phoenix including John F. Long, Carroll Smith, Ernie Sauer, Paul Nemsky, George Haner, Douglas Horne and Harry Kessler, to furnish a rubber base paint for use by them in painting houses in certain subdivisions to the City of Phoenix in 1953 and 1954. The process by which an agreement was reached between Lemon and the contractors was that Lemon would furnish the paint for use by the contractors in painting sample or model homes which he agreed to sell to the contractors at a specified price. The paint was what is known as a rubberized or a rubber base paint.

Lemon, during the negotiations, would prepare and deliver to said contractors what was known to the trade as a color card which, we understand to be a card showing all the different shades of color he would be able to furnish to the contractor for use in the particular subdivision in which the contractor was interested. If the price was right and the quality of the paint and the colors shown on the color card met the approval of the paint contractor, he would then accept Lemon's offer to furnish the paint for the houses in that particular subdivision. Both Lemon and the contractors testified in substance that it was contemplated that each would carry out his part of the contract because failure to do so would not only cause a material delay in the painting operations but would require new negotiations concerning price, color and quality of another paint with another paint dealer, and the approval of a new color card matching as nearly as possible the one prepared by Lemon and accepted by the paint contractors. Such a change would necessarily require the touching-up of paint jobs already done in that subdivision because of the inability to exactly match the original colors used by Lemon and would entail a heavy expense to the contractor, and two weeks to one month's delay on the job.

All of the sample or model houses were painted with what was known as Tempolite, a Synkoloid Company rubberized paint for which Isenbergs were the exclusive distributor in the Phoenix area. Lemon purchased said Tempolite from Isenbergs whose business was located in Los Angeles. In addition to being distributor for the Synkoloid products the Isenbergs were and had been a manufacturer of paint for many years.

Although Lemon had been a customer of Isenbergs for more than a year he purchased his first rubberized paint (Tempolite) from Isenbergs in December 1953, which was largely used by him as above stated, in painting model or sample houses in different subdivisions as a part of the process of negotiating with paint contrac-

tors for the job of painting the houses to be built therein. Considerable demand had apparently been created for the use of rubberized paint in Phoenix and Lemon was one of Isenbergs' largest customers.

Isenbergs decided in late 1953 to manufacture a rubber base paint for sale similar in quality to Tempolite which was to be sold under the name of Irolite. They proposed to Lemon that he use their paint instead of Tempolite. Upon the representation of Isenbergs to Lemon that they guaranteed their new rubberized paint to be equal in quality in every particular to the Tempolite rubberized paint theretofore purchased by Lemon from Isenbergs, and upon the further representation that they would sell it to him at the same price he had been paying them for Tempolite, Lemon agreed to purchase Isenbergs' paint instead of Tempolite for use by said paint contractors, and for sale generally. It was agreed between Lemon and the Isenbergs that Lemon was to use his "Red Lemon Colors" label on the cans and that said cans would further carry the designation "Paqua" or "Paka". No explanation appears in the record as to the significance of the words "Paqua" or "Paka" and it appears to be immaterial here. However, Lemon was doing business under the name of "Red Lemon Colors" which did have significance as a trade name. The Isenbergs produced their first batch of rubberized paint in early 1954 and Lemon purchased 150 gallons of said paint from Isenbergs in late February 1954, and 150 or 200 gallons of Tempolite.

The contractors were satisfied with the quality of the Tempolite paint and had approved the colors to be used in their respective subdivisions, and had agreed to purchase said rubberized paint therefor from Lemon. He then began to deliver to said contractors the rubberized paint manufactured by Isenbergs. The contractors began to use it in painting houses then being completed on their respective jobs and each of them who testified stated they found said paint to be so inferior that they could not use it. Specifically it gummed the brushes so badly in only a few minutes that the brush could not be used without being cleaned. The paint would not spread properly and it faded sometimes within a few hours. Lemon testified the other contractors complained of the same difficulties. After ascertaining the unfitness of said paint all of the contractors refused to accept further shipments thereof.

Upon complaint to Lemon by said contractors he called Isenbergs over the phone and reported the trouble. He was advised by Isenbergs to use soap in the water with which the paint was mixed and was guaranteed that the next shipment would be equal in quality to Tempolite. The use of soap as directed did not correct the difficulty and the next shipment was no improvement over the first. The Isenbergs each time again guaranteed that the next batch would

equal Tempolite in quality. After the contractors refused to further use the Isenbergs' paint Lemon tried to purchase Tempolite from them but they refused to furnish it saying they were unable to get it in stock and continued to ship him their Irolite paint instead.

During the period from February 24, 1954 to April 2 following, they shipped to Lemon approximately 2000 gallons of Irolite paint after being informed that it was unfit for use for the purpose for which it was purchased. The contractors had all cancelled their agreements with Lemon. Those who testified stated they would have continued to purchase their paint from Lemon if the paint had been like that used on their sample or model houses. Isenbergs refused to either furnish Tempolite to Lemon or to furnish a paint of equal quality as they warranted they would do. The Synkoloid Company refused to sell Tempolite to Lemon upon the ground that the Isenbergs were their distributor for the Phoenix area. Isenbergs also refused to adjust the matter of damages that Lemon claims to have suffered as a result of their breach of warranty to furnish a rubberized paint equal in quality to Tempolite. Thereafter Lemon instituted this action against Isenbergs with the results above stated.

Before considering the assignments of error let us examine the complaint to ascertain the nature and extent of the relief sought by Lemon. From a careful examination of that instrument it will be observed that he has limited his recovery of damages for the alleged breach of warranty "as a result of the defects in the paint furnished him by defendant (Isenbergs)" to: (1) the discredit of his trade name (Red Lemon Colors), (2) great and continuing harm in his business relations, and (3) recovery of damages for the worthless paint purchased from Isenbergs which he then had on hand. There is no allegation in the complaint upon which to base damages for loss of profits, yet, most of his evidence was apparently intended to establish a loss of profit.

It is the general rule as argued by counsel for Isenbergs that the measure of damages for breach of warranty in the absence of special circumstances showing proximate damages of a greater amount, is the difference between the value of the goods at the time of the delivery and the value they would have had if they had been as warranted. A.R.S. § 44–269(G), Stott v. Johnston, 36 Cal.2d 864, 229 P.2d 348, 28 A.L.R.2d 580.

Although the pleadings allege that the paint was purchased by Lemon for resale in the plaintiff's business, it is clear, from the evidence, that the primary purpose of the purchase of Isenbergs' Irolite rubberized paint was to comply with agreements Lemon had with a number of large paint contractors to whom he had agreed

to furnish paint for use in painting several hundred houses in different subdivisions in and around Phoenix and that it was to be used as a substitute for Tempolite paint, a Synkoloid product. The allegation is that the rubberized paint was being manufactured by the Isenbergs for Lemon and the inference is clear from the evidence that Isenbergs knew of the demand for that kind of paint in Phoenix from their business with Lemon, and the source from which this demand was coming. Lemon had furnished the Isenbergs the color card which said paint contractors had approved and accepted in order that the Isenbergs could match the colors of their Irolite paint with it. It was therefore in the contemplation of the parties at the time Lemon agreed to buy the rubber base paint manufactured by the Isenbergs as a substitute for Tempolite, that it was to be used by Lemon primarily for resale to paint contractors in Phoenix for use by them in the large building construction business in Phoenix. Hence, under all of the authorities, recovery for loss of profits and for loss of good will may be recovered in the instant action based upon a breach of warranty if the complaint is amended to encompass such loss. Stott v. Johnston, supra.

■ The appellants have made but little effort to conform with 17 A.R.S. Rule 5 (c) of this court relating to assignments. Assignment I consists of an admixture of an allegation of error and two pages of argument in support of same. It appears to be claimed in this assignment that the court erred in denying appellants' motion for a new trial upon the ground that it is not supported by the evidence and is contrary to law, in that the evidence of special damages is based upon estimation, conjecture and speculation, and that damages for good will and loss of profits were not recoverable under the circumstances of this case. And as a catchall it is argued that the paint was purchased upon sample and that Lemon continued to purchase it after he knew of its defects. An analysis of the evidence in a light most favorable to sustaining the judgment does not support this contention at all. Notwithstanding its defects we will consider it as to the sufficiency of the evidence.

Assignment II is based upon the court's order denying appellants' motion to exclude the question of special damages from the jury upon the grounds set forth in Assignment I.

Assignment III asserts the court erred in denying appellants' motion to dismiss appellee's entire cause of action for the reasons set forth in Assignment I. We will therefore consider Assignments I, II and III together.

Assignments IV and V are based upon the claim that the court erred in setting aside judgment in favor of appellants on their counterclaim and in denying their

motion to vacate said order. They will also be considered together.

Assignments VI, VII, VIII, IX and X are directed at certain instructions given by the court at the request of appellee asserting that appellants' requested instructions on the same subjects correctly stated the law and of course should have been given. With the exception of Assignments IX and X they completely fail to comply with Rule 5(c), subds. 4 and 5 in that they do not point out in what particular these instructions fail to state the law. In the instant case counsel made no reference in his brief to the instructions other than to assert that the court erred in giving them. We will therefore treat them as having been abandoned and will not consider them.

In determining the issues raised in Assignments I, II and III we must of necessity look to the transcript of evidence consisting of 930 odd pages, most of which is chaff. Much time and paper were consumed in voir dire examination when voir dire examination was not in order, and very much more unnecessary time was consumed in repetitious wrangling over the question of whether Lemon had a contract with paint contractors Carroll Smith, Ernie Sauer, Paul Nemsky, George Haner, Douglas Horne, Harry Kessler and John Long.

Although not assigned as error it is argued at length by appellants that inasmuch as Lemon did not have a written contract and inasmuch as either party could terminate the contract at will there was no binding contract between Lemon and said paint contractors. Because of its importance on a new trial we will consider the question. The position is not sound. There is no law requiring that such contracts shall be in writing nor is it the law that because one party to a contract may for any reason refuse to further perform it this renders such contract invalid. If this were true no contract would be valid. Refusal or failure of either Lemon or the paint contractors to perform would have given rise to a cause of action as in any other contract. Under the evidence in this case Lemon had a firm contract with said paint contractors to furnish rubberized paint for all houses in the particular subdivision concerning which the contract was made.

Paint contractors Ernie Sauer and Carroll Smith, and John Long, who is primarily a building contractor, all testified that they would have continued to buy paint from Lemon if it had been of the same quality and colors as that used on the sample or model homes which the evidence shows was Tempolite.

Sauer testified that he bid on large tracts and had 340 houses in the tract he intended to paint with the rubberized paint

he agreed to purchase from Lemon and that he had since painted 800 houses. Carroll Smith testified there were 350 houses in the subdivision for which he agreed to purchase paint from Lemon, and that since then he had purchased $200,000 worth of paint but didn't know the number of houses he had painted since and that he was then giving Lemon ninety to ninety-five per cent of his business. John Long called by Isenbergs testified he was then painting 8 houses per day at the time he entered into the agreement with Lemon to purchase rubberized paint from him but didn't know how many houses were in the tract.

From the verdict and judgment, it is obvious that there was not the slightest doubt either in the mind of the jury or of the court but that the paint manufactured by the Isenbergs and sold to Lemon was completely worthless as a paint for house painting purposes. Sauer testified that Lemon gave him 38 gallons and that he returned part of it and threw the other in the dump. Similarly there was no doubt in the minds of the jurors that Lemon lost the business of these large paint contractors because they could not use the Isenbergs' paint and that the reputation or good will of his business was damaged. Sauer gave testimony to that effect.

Lemon testified that at the time he entered into the agreements with said paint contractors they were working on approximately six or seven hundred houses and that he was governed by this fact in ordering his supply of paint from the Isenbergs. He stated he sold to the contractors of the largest housing projects in Phoenix and that he sold them "near 100 per cent" of the rubberized paints used by them which constituted the bulk of his business. That about 25% of his business was with small purchasers and that his business dropped off 50% after his attempt to sell the Isenbergs' paint. Lemon testified that he was obligated to Isenbergs in the sum of $3800 at the date of trial but that the paint purchased for which he was obligated was worthless.

The Isenbergs knew at least after, if not before, the contractors tried to use their paint and found it unfit for use, that it was imperative that Lemon supply these contractors with a paint equal in quality in every respect to Tempolite, if he were to hold their business. Lemon exhausted every effort to have them do so. They and their chemist also knew that their Irolite paint was being used by all of said contractors to paint both the exterior and, interior of houses in their respective subdivisions and they knew that it was grievously defective. It is significant that they did not tell said contractors that they "expressly designed and manufactured said paint for interior use only" instead of telling them to use soap in mixing it. The elder Isenberg made at least two

trips to Phoenix to personally investigate the cause of complaint by said paint contractors and on one occasion brought with him their chemist who was familiar with the formula of their Irolite paint. Neither of them divulged to said contractors, so far as the record discloses, that said paint was for interior use only.

· It is also significant that the Isenbergs refused to sell Lemon Tempolite paint for use by him on the exterior of the houses being painted by said paint contractors.

 We are therefore of the view that there existed in the instant case special circumstances showing proximate damage of a greater amount than the difference between the value of the goods at the time of delivery and their value if they had answered to the warranty. We are also of the view that the jury was fully justified in believing that the express warranty given to Lemon by the Isenbergs, as to the quality and uses of said Irolite paint, was not limited to interior use only. All the facts and circumstances refute such a claim. We will therefore proceed to discuss the assignments of error.

 Assignment I questions the sufficiency of the evidence to support the verdict and judgment of the court. In the first place we are compelled to discard the consideration of damages based upon loss of profits because the complaint does not base any part of Lemon's claim upon that ground, and the evidence is insufficient to support a claim based upon such a loss if it had been alleged. It is quite remarkable that Lemon has not at any place in the record produced definite evidence as to the number of houses included in the subdivisions to be painted by said paint contractors with whom he had contracts, or the number of houses involved.

It is not at all strange however that Lemon did not know precisely how many houses were to be built and would require painting in each of the subdivisions covered by contracts between him and the paint contractors at the time the contract was made. But this information had been available to him for two years at the date of the trial by the testimony of the contractors themselves. Only three of the contractors were called as witnesses. The contractors could have given that information and they could also have testified whether Lemon would have continued to get their business if he had continued to supply them with the same quality of paint used in painting the sample and model houses. This would certainly be admissible on the question of the value of the loss of good will. Lemon's testimony as to the number of houses covered by his contracts with paint contractors was based on estimates which ranged from 1,800 to 3,000 houses. He testified at the trial he estimated the number of houses covered by his contracts to be 1,800 to 1,900 but admitted he had previously stated the number was 3,000 and could not say which was correct.

Furthermore, he was unable to do more than estimate the average profit per house. He estimated the average profit to be $15. He stated square footage in the house was immaterial; that he based his estimate upon the number of gallons of paint used and when asked how many gallons would be required for the average house, he testified 10 to 12 gallons, and later in his testimony he said 10 to 20 gallons. He stated that 1,000 to 1250 square feet would constitute an average of all the houses in Phoenix.

The courts hold that damages resulting from the loss of good will need not be proved with mathematical precision, Hacker Pipe & Supply Co. v. Chapman Valve Mfg. Co., 17 Cal.App.2d 265, 267, 61 P.2d 944, but that only the best evidence is all that is required. Steelduct Co. v. Henger-Seltzer Co., 26 Cal.2d 634, 160 P.2d 804. Proof of loss of profits requires much more definiteness because it is capable of proof in many cases with at least an approximation of mathematical precision. See White River Sheep Co. v. Barkley, 37 Ariz. 49, 288 P. 1029, on the sufficiency of evidence in such cases. An estimated 1,800 to 3,000 houses at an estimated average profit of $15 per house based upon an estimated number of gallons of paint used per house varying from 10 to 12 gallons at one time and at an average of 10 to 20 gallons at another is entirely inadequate to prove either loss of profits or damages for loss of good will.

Assignments IV and V are without merit. The Isenbergs were deprived of no right whatever by the action of the court in setting aside the judgment by consent on the counterclaim. They may even have profited as a result of it. Although it was an idle thing to do at the time it was done, the court awarded them all they could possibly have recovered on a trial of the case. It was deducted from the judgment recovered. Lemon had alleged in his complaint damages for breach of warranty which, as it applied to this item would have been the difference between its value when it was received and its value if it had been as warranted. Lemon testified it was worthless and the jury could have so found upon trial if it had given the same credence to Lemon's testimony on that point as it appeared to have done on all other issues. In such event no deductions from the judgment of $31,800 would have been possible.

The judgment is reversed and the case is remanded for a new trial solely upon the question of damages on the complaint and for trial on all issues on the counterclaim.

UDALL, C. J., and JOHNSON, WINDES and STRUCKMEYER, JJ., concur.