[Civ. No. 29613.    Second Dist., Div. Four.    June 16, 1967.]

THE GENERAL ADVERTISING AGENCY, INC., Plaintiff and Appellant, v. MAX KOMER et al., Defendants and Appellants.

George R. Maury for Plaintiff and Appellant.

Smither, Good, Potter, Wildman & Gregory, Good, Potter & Wildman and Paul W. Wildman for Defendants and Appellants.

FILES, P. J.—This action for unfair competition was tried before the court sitting without a jury, resulting in an award of damages in favor of plaintiff and against certain defendants. The latter are appealing from the judgment.

Plaintiff filed a cross-appeal from the judgment insofar as

it denied an injunction, but in its brief plaintiff asks that that appeal be dismissed.

### Background

Plaintiff, The General Advertising Agency, Inc., hereinafter referred to as General, was incorporated October 31, 1961, to engage in the business of an advertising agency. Its incorporators were defendant Max Komer, and Ralf Spangler, both experienced advertising men, and H. H. Robertson, a public accountant. Each invested $3,350 cash for a third of the stock. On November 12. 1961, Spangler died. His widow, May Spangler, who had had 30 years' experience in advertising, assumed his place in the company. Mrs. Spangler became president and Komer vice president. The three stockholders served as directors.

In early 1962 General was engaged by defendant Mayfair Markets as its agent in a campaign of "cooperative advertising." This was a system whereby Mayfair purchased radio advertising time in quantity and in effect resold it to the suppliers of various items sold in Mayfair stores. Mayfair entered into a series of contracts with suppliers, whereby the supplier would pay Mayfair $25 for each "spot" advertisement of one of its products. For its services in this campaign General was to receive from each radio station 15 percent of what it charged Mayfair, and in addition General was to receive from Mayfair 15 percent of what it charged the suppliers. Between April 4 and July 2, 1962, employees of General, acting as Mayfair's agents, executed approximately 30 contracts between Mayfair and cooperating suppliers.

In July 1962 disagreements developed between Komer and Mrs. Spangler. One controversy arose because Mrs. Spangler contended that Komer's salary of $1,000 per month was excessive, in relation to the amount of business the company was doing. The record contains suggestions that there were other issues. At any rate, the dispute reached the point that on July 12, 1962, an attorney representing Komer met with an attorney representing either the corporation or Mrs. Spangler to discuss a separation of their interests. On July 26, 1962, the stockholders met in formal stockholders' and directors' meetings, attended by attorneys and a shorthand reporter. Komer resigned as vice president, but declined to resign as a director because (as he explained later) he desired to have access to the books of the company so long as he was a shareholder.

On or about August 1, 1962, Komer became affiliated with Richard C. Russell, Inc., a competing advertising agency.

On July 19, 1962, Mayfair discharged General as its advertising agent, and on August 1 Mayfair engaged Richard C. Russell, Inc. On July 19 The California Leather Company discharged General, and on July 20 Grand Central Public Market, Inc. discharged General. Both became clients of Richard C. Russell, Inc. thereafter.

This action was filed by General on August 31, 1962, alleging that Komer had breached his fiduciary duty to plaintiff, and that Komer, Mayfair, and others had conspired to compete unfairly. A corporation known as Y & K Advertising Associates, Inc. was subsequently joined as a defendant.

On November 15, 1962, Komer resigned as a director of General.

The trial court found that Komer, in violation of his fiduciary duties as a director, had formed an advertising agency to take the Mayfair, California Leather and Grand Central accounts away from plaintiff, to plaintiff's damage in the amount of $5,000; and that Komer had conspired with Mayfair to deprive plaintiff of the cooperative advertising contracts, thereby causing plaintiff a loss of profits in the amount of $5,000. Judgment was entered in favor of plaintiff against Komer and Y & K in the sum of $10,000, of which Mayfair was jointly and severally liable with the others to the extent of $5,000.

*Liability of Komer*

A director owes a fiduciary duty towards his corporation, and if he misuses his position of trust to further his private interest at the expense of the corporation, he may be held liable for the damage or accountable for any benefits which he obtains thereby. (*Bancroft-Whitney Co.* v. *Glen,* 64 Cal.2d 327 [49 Cal.Rptr. 825, 411 P.2d 921] ; *Sequoia Vacuum Systems* v. *Stransky,* 229 Cal.App.2d 281, 286 [40 Cal.Rptr. 203] ; *Xum Speegle, Inc.* v. *Fields,* 216 Cal.App.2d 546, 554 [31 Cal.Rptr. 104].)

The evidence here is sufficient to support the implied finding of the trial court that Komer misused his position to persuade Mayfair, California Leather and Grand Central to leave General and become the clients of another agency. In July 1962 Komer told Mr. Svehla, the Los Angeles division manager for Mayfair, that General was about to undertake a cooperative advertising program for Food Giant Markets,

which was a Mayfair competitor. Mr. Svehla said this made it necessary for Mayfair to change agencies. Mrs. Spangler testified that although there had been some discussion about Food Giant, General would never have undertaken to represent that company so long as Mayfair was General's client. The trial court could reasonably have concluded that Komer employed a dishonest device to switch the Mayfair account.

There is also evidence that Komer told both California Leather and Grand Central that General was about to dissolve. It is a permissible inference that these clients were led to believe that General would no longer be available to serve them, and that this misinformation induced them to terminate. Komer's position as a director gave special credibility to his statement that General would dissolve.

### Damages

■ The entire judgment must be reversed because of an absence of any evidence that plaintiff was damaged. The burden of proving damages in a case of this kind is not a heavy one.

"The law only requires that the best evidence be adduced of which the nature of the case is capable (*Steelduct Co.* v. *Henger-Seltzer Co.,* 26 Cal.2d 634, 651 [160 P.2d 804]), and the defendant whose wrongful act gave rise to the injury will not be heard to complain that the amount thereof cannot be determined with mathematical precision." (*Stott* v. *Johnston,* 36 Cal.2d 864, 876 [229 P.2d 348, 28 A.L.R.2d 580].)

Nevertheless, even by this liberal standard, plaintiff has failed to make a showing.

The arrangement between General and Mayfair, as it existed between April and July 1962, was not evidenced by anything in writing except a one-sentence letter appointing General as Mayfair's "authorized Advertising Agency" effective May 1, 1962. The oral testimony sheds little light upon it except to show that General was to perform services and was to receive a commission of 15 percent from the radio stations and 15 percent from Mayfair. These commissions were not earned when the cooperating suppliers signed the contracts with Mayfair. Substantial services thereafter were required. Mr. Fritz, who was employed by General as an account executive on the Mayfair account, testified that conducting the campaign, after the contracts have been signed "can be done with as few as two people, and it might require four or five

people." When asked by plaintiff's counsel what the ratio of cost to gross commissions should be, he answered "Actually, they vary, depending on the operation that is conducting the cooperative campaign." He testified: "Q. It depends on the efficiency of the people, doesn't it? A. Yes." Efforts of counsel to obtain a more definite answer from the witness were unavailing.

Mrs. Spangler, General's president, gave this testimony: "Q. Do you have any idea what the actual, we will call it, net profit would have been? A. I couldn't answer. Depending upon the personnel."

It should be observed that there was nothing unique about the Mayfair cooperative advertising campaign. Fritz testified that he had been using this kind of advertising for other market chains over the past 10 years. It might be thought that business people, entering into a new enterprise, would have made some projections of the expenses and profits to be anticipated, on the basis of industry experience, but the plaintiff here failed to show any such thing.

The only evidence of plaintiff's profit and loss position is an audit report of April 30, 1963. This shows a deficit of $7,610.62 as of October 31, 1962, and a net loss of $4,516.53 for the six months ending April 30, 1963. This document is of little value except to remind us that not every business makes a profit.

Plaintiff called as a witness its stockholder and director, H. H. Robertson, a public accountant, who testified that he had accompanied plaintiff's attorney to the office of Richard C. Russell, Inc. and examined its records. Mr. Robertson then produced a list of the gross revenues of that company from August 1, 1962, to May 31, 1963, and also a list of the drawings and expenses of Komer during that period. The witness was not asked and he did not testify about the expenses of the Russell company, or whether its books showed a profit or a loss. There is no explanation for this omission.

During the trial, which took place in September 1964, plaintiff elicited from Komer the fact that Yambert-Komer, Inc. had handled the Mayfair account since April 1, 1964. Komer was asked how much profit that agency had made from the Mayfair account, and he responded "I don't believe we have made any."

The fact that Mayfair, California Leather and Grand Central employed Komer's new agency, and that commissions in

particular amounts were paid, does not support the finding of the trial court that plaintiff was damaged in the amount of $10,000.

There is a complete lack of any evidence as to the actual or estimated costs of servicing any of the accounts, although actual cost figures were available to plaintiff; there is the admission of plaintiff's president that the possibility of profit depended upon contingencies which she could not evaluate; and there is no evidence that any advertising agency ever made a profit from this business.

### Liability of Other Defendants

■ For the guidance of the trial court in the event of a retrial we should mention the absence of any proof in this record as to any liability on the part of two of the corporate defendants.

The evidence shows, without contradiction, that Mayfair terminated its business relationship with General because it believed General was about to commence an advertising campaign for Food Giant Markets. Komer also testified, without contradiction, that about July 15, 1962, he had told the Mayfair executives that the stockholders had agreed to liquidate General and go their separate ways. Although this information was false, there was no reason for Mayfair to doubt it at the time. The contractual arrangement between General and Mayfair was terminable at the will of either party. Under the circumstances it was not improper for Mayfair to terminate General and follow Komer to the Russell agency. Mayfair did not induce Komer to breach his duty towards General, nor did it join with him in any agreement or concert of action with any wrongful act as its objective. The trial court's conclusion that Mayfair "conspired" with Komer is unsupported by this record.

The remarks of the trial judge suggest a belief that General had performed services for Mayfair in the cooperative campaign for which General was entitled to be paid. Just what General did between April and July 1962 is not fully developed in the record. But it is clear that the trial court made no award of damages upon any contract or quasi contract theory. There is nothing in the findings as to the value of any services rendered by General or as to the amount of compensation which was promised or otherwise payable for such services. The award of damages, as appears from the findings, was solely to compensate General for its alleged loss of profits.

With respect to the defendant Y & K Advertising Associates, Inc., the evidence shows only that the corporation was organized June 1, 1963, with Komer as one of the incorporators, and that it serviced the Mayfair cooperative advertising account until another corporation was formed the following April. There cannot possibly be any basis for the trial court's finding that in July 1962 this corporation conspired with Komer and others to influence General's clients to withdraw their accounts.

Plaintiff argues that Y & K is liable upon the theory that one who knowingly joins a conspiracy after its formation becomes a party to it. The short answer is that as of June 1, 1963, there wasn't any conspiracy. The only wrongful acts of which there is any evidence were committed in July 1962. Y & K had nothing to do with these.

On defendants' appeal, the judgment is reversed. Plaintiff's appeal is dismissed.

Jefferson, J., and Kingsley, J., concurred.